IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-02088-MSK-BNB

ROBERTA SILVER,

        Plaintiff,

v.

PRIMERO REORGANIZED SCHOOL DISTRICT NO. 2,
MICHAEL SPARACO,
DANIEL NUSCHY, JR., and
HEIDI DASKO,

        Defendants.

---

## OPINION AND ORDER GRANTING, IN PART, MOTIONS TO DISMISS

---

**THIS MATTER** comes before the Court pursuant to Defendant Sparaco's Motion to Dismiss[1] **(# 27)**, the Plaintiff's response **(# 35)**, and Defendant Sparaco's reply **(# 39)**; and Defendants Dasko's Motion to Dismiss **(# 29)**, the Plaintiff's response **(# 36)**, and Defendant Dasko's **(# 43)**.[2]

## FACTS

---

[1]This motion appears to supercede Defendant Sparaco's prior Motion to Dismiss **(# 8)**, and the earlier motion is deemed withdrawn.

[2]Defendant Nuschy filed a Motion to Dismiss **(# 4)** directed at allegations in the original Complaint **(# 1)**, stating that the Complaint failed to designate which Defendants were the subject of which claims, and seeking to dismiss all but the outrageous conduct claim as not being directed at him. The Plaintiff's subsequent Amended Complaint **(# 22)** cures any ambiguity by expressly naming the Defendants subject to each claim, and makes clear that the Plaintiff only asserts an outrageous conduct claim against Defendant Nuschy. Accordingly, Defendant Nuschy's motion to dismiss is denied as moot.

According to the Amended Complaint (**# 22**), the Plaintiff was employed as a Pre-School Teacher's Assistance in a school operated by Primero Reorganized School District No. 2's ("the District").  In 2004, the Plaintiff confided in Defendant Dasko, a school Counselor, regarding personal matters.  Although the Plaintiff believes she shared the information with Defendant Dasko in confidence, Defendant Dasko thereafter conveyed some or all of that personal information to Defendant Nuschy, the school's Principal.  Defendant Nuschy later entered into a wager with another District employee as to whether or not Defendant Nuschy would have sex with the Plaintiff before the end of the school year.  Using the information gleaned from Defendant Dasko, Defendant Nuschy "prey[ed] upon the emotions" of the Plaintiff, and the two began a sexual relationship.

At first, the Plaintiff enjoyed the benefits of the relationship, which included positive attention from Defendant Sparaco, and an indication that, contrary to earlier representations, Defendant Nuschy might be able to arrange for the Plaintiff to teach her own pre-school class.  However, when the Plaintiff learned in March 2005 of Defendant Nuschy's wager, she ended the relationship.  Defendant Nuschy did not willingly surrender the relationship, and made several unwelcome phone calls, e-mails, and visits to the Plaintiff's house.  The Plaintiff ultimately obtained a Restraining Order against Defendant Nuschy.  Thereafter, the Plaintiff observed that Defendant Sparaco's treatment of her deteriorated, and Defendant Sparaco advised the Plaintiff that she would no longer enjoy the same unfettered presence at the school that she enjoyed during her relationship with Defendant Nuschy; instead, Defendant Sparaco instructed the Plaintiff that she was limited to being in her immediate work area, the gym, the cafeteria, and, if necessary, the

office.  In May 2005, the Plaintiff was advised that her annual employment with the District would not be renewed.

The Plaintiff alleges five causes of action: (i) wrongful discharge in violation of public policy against the District; (ii) hostile environment sexual harassment under Title VII against the District; (iii) *quid pro quo* sexual harassment under Title VII against the District; (iv) invasion of privacy against Defendant Dasko, arising from her disclosure of the Plaintiff's confidential communications; and (v) outrageous conduct against Defendants Sparaco, Nuschy, and Dasko.[3]

Defendant Sparaco moves to dismiss **(# 27)** the sole claim against him, for outrageous conduct, arguing that the allegations in the Amended Complaint fail to identify conduct that rises to an actionable level.  Defendants Dasko moves to dismiss **(# 29)** the invasion of privacy claim against her, alleging that the Plaintiff did not adequately allege that the Plaintiff disclosed facts that were "private in nature," that Defendant Dasko's disclosure was made to the public; that the disclosure would be highly offensive to a reasonable person, that the material disclosed was not of public concern, or that Defendant Dasko disclosed with information with willful or wanton intent. In addition, Defendant Dasko also moves to dismiss the outrageous conduct claim for failure to identify sufficiently outrageous conduct.

---

[3]The caption of this claim asserts that it is alleged only against the individual Defendants. The allegations in the body of the claim appear to contemplate that the claim is also asserted against the District.  The Court will assume that the specific identification of the Defendants in the caption of the claim is intended to be controlling.

## ANALYSIS

### A.  Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall*, 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997); *but see Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007) (factual basis for the allegations in the complaint must be concrete enough to rise above a speculative level, and conclusory assertions are insufficient to satisfy the plaintiff's burden of pleading adequate facts to support each claim).  The Court must limit its review to the four corners of the complaint, plus exhibits attached to the complaint or material referenced in the complaint and upon which the plaintiff's claims arise, so long as the authenticity of such material is not disputed.  *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

### B.  Outrageous conduct

Both Defendants Sparaco and Dasko challenge the sufficiency of the Plaintiff's allegations supporting the fifth cause of action, sounding in outrageous conduct.  Specifically, the Amended Complaint alleges that Defendant Dasko engaged in outrageous conduct by "publicizing private

facts about the Plaintiff's personal life and invading Plaintiff's privacy – which led to a 'bet' on who would sleep with Plaintiff."  As to Defendant Sparaco, the Plaintiff alleges that he engaged in outrageous conduct by "[changing his] attitude towards Plaintiff . . . depending on whether Plaintiff was having sex with Defendant Nuschy[ ] or not"; by "placing limitations on where Plaintiff's presence at school was welcome" as a result of her terminating the relationship with Defendant Nuschy; and by terminating the Plaintiff's employment in response to her ending her relationship with Defendant Nuschy.

Under Colorado law, the elements of the tort of outrageous conduct are: (i) that the defendant engaged in extreme and outrageous conduct; (ii) that it did so recklessly, or with the intent to cause the plaintiff severe emotional distress; and (iii) that the conduct caused the plaintiff to suffer such distress.  *Riske v. King Soopers*, 366 F.3d 1085, 1089 (10th Cir. 2004), *citing Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002).  To satisfy the first element, the plaintiff must allege conduct that "goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community."  *Id., citing Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970) *and Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988).  The tort is intended to reach "a very narrow" type of conduct.  *Green v. Qwest Services Corp.*, 155 P.3d 383, 386-87 (Colo. App. 2006) (collecting cases).  The type of conduct actionable under this claim is that which "the recitation of facts to an average member of the community would . . . lead him to exclaim 'Outrageous!'"  *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970), *citing* Restatement (Second) Torts, § 46, comment d.

The outcome of several cases involving similar facts is helpful in assessing the sufficiency of the Plaintiff's allegations.  In *Riske*, the 10th Circuit held that allegations that an employee had

5

been subjected to nearly three years of unwanted gifts and disturbing notes from an anonymous

suitor (later shown to be her manager), coupled with her manager "stalk[ing] her and follow[ing]

her around the store" for several months, "presents a close question," but "comes so close to the

bounds of decency that reasonable people could disagree about whether it constitutes actionable

conduct." 366 F.3d at 1089. Among the factors that the court found important were the length

of time over which the conduct occurred, and the managerial relationship involved. *Id.*

In *Donohue v. Hoey*, 109 Fed.Appx. 340, 369-70 (10th Cir. 2004) (unpublished),[4] the

defendant was a police officer to whom the family of a crime victim had related in confidence

"several sensitive details" about their lives, in order to advance the criminal investigation. When

the family members later became vocal critics of the police, the officer disclosed the family's

confidences to a reporter. *Id.* at 350-51. Without engaging in extended discussion, the 10th

Circuit affirmed a grant of summary judgment on an outrageous conduct claim stemming from

this allegation, merely observing that "[w]e cannot conclude that the conversation with [the

reporter], though probably mean-spirited and unkind, rose to the level of outrageous conduct

contemplated by this tort." *Id.* at 370.

In *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999), the Colorado Supreme

Court found that an employee's claim that he was fired by his employer as a scapegoat to conceal

illegal conduct by the employer did not allege sufficiently outrageous conduct to state a claim.

---

[4]Pursuant to 10th Cir. R. 32.1, *Donohue* is not cited for any precedential value. Rather, it is merely an illustration of the types of facts that courts have previously found to be insufficient to state a claim for outrageous conduct. As required by Rule 32.1(b), a copy of *Donohue* is attached hereto.

This Court finds that the Plaintiff's allegations against both Defendants Dasko and

Sparaco fail to assert sufficiently outrageous conduct. Turning first to Defendant Dasko, the

Plaintiff alleges a single instance[5] of conduct in which the Plaintiff told Defendant Dasko certain

personal information in confidence, and Defendant Dasko failed to keep the information secret.

Although these facts are quite similar to those found insufficient to state a claim in *Donohue*, the

Court need not draw upon caselaw to conclude that such conduct does not rise to the level of

"atrocious" and "utterly intolerable in a civilized community."  To the contrary, a breach of trust

by a supposed confidant[6] is so common in every individual's experience that it has become a

---

[5]In her response to Defendant Dasko's motion, the Plaintiff attaches evidentiary material in the form of transcripts of certain phone calls by Defendant Nuschy, and makes certain assertions of fact as to Defendant Dasko's theoretical involvement with those calls that are not found within the four corners of the Amended Complaint.  Even assuming that the Court could consider the transcript of calls as a document referenced in the Amended Complaint and central to the Plaintiff's claim, it does not suffice to demonstrate the otherwise unsupported facts of Defendant Dasko's involvement as urged in the Plantiff's response.  In any event, even crediting the entirety of the Plaintiff's argument as to Defendant Dasko having several conversations with Defendant Nuschy, and making calls in close proximity to those made by Defendant Nuschy, the Court nevertheless finds that the Plaintiff has failed to allege conduct rising to the level of outrage necessary to state a claim.

[6]It is not clear whether the Plaintiff alleges that her discussions with Defendant Dasko were done in Defendant Dasko's professional capacity as a Counselor, rather than in the nature of a private, confidential conversation between friends.  Assuming that the Plaintiff alleges that Defendant Dasko breached a confidence reposed in her as part of her professional capacity as a Counselor, the Court nevertheless finds this insufficient to state a claim for outrageous conduct. Although the Plaintiff might have grounds to file a grievance against Defendant Dasko with the appropriate licensing board, the simple breach of a patient's confidence, without more, does not rise to the level of outrageous conduct.  *Compare Montoya By and Through Montoya v. Bebensee*, 761 P.2d 285, 290 (Colo. App. 1988) (permitting outrageous conduct claim based on unlicensed counselor's alleged bad-faith actions of revealing patient's claim of sexual abuse to county officials, advising of custodial parent to restrict visitation of alleged abuser, and testifying on behalf of custodial parent against alleged abuser).

standard element of countless examples of popular entertainment.  Accordingly, the Court finds that the Plaintiff has failed to state a claim for outrageous conduct against Defendant Dasko.

With regard to Defendant Sparaco, the Plaintiff alleges three types of conduct: Defendant Sparaco treating her better when she was dating Defendant Nuschy; withdrawing such positive treatment and restricting her authority to move about the school after the relationship ended; and terminating her employment, ostensibly in retaliation for ending the relationship.  Although the allegations against Defendant Sparaco do allege an abuse of managerial authority – one of the factors favoring a finding of outrage in *Riske* – that factor alone is insufficient to convert otherwise unactionable conduct into that sufficient to support a claim.[7]  For example, the termination of the employee in *Floyd* certainly carried the imprimatur of management action, yet the allegations that management terminated him as a scapegoat to cover up the employer's extensive criminal conduct nevertheless failed to state a claim.  Indeed, a useful comparison can be drawn between the allegation in *Floyd* – that the employee was terminated to cover up criminal conduct by the employer – and the comparatively benign allegation here – that Defendant Sparaco terminated the Plaintiff in retaliation for her breaking off a romantic relationship with Defendant Nuschy.  As in *Floyd*, this Court finds that the Plaintiff's allegation of unjust termination does not allege sufficiently outrageous conduct.  Likewise, the remaining allegations – an individual's receipt of positive attention and benefits from the friends of their paramour during a relationship, or the loss of that attention and benefits when the relationship ends – are events so common in

---

[7]Notably, the other important factor from *Riske* – the length of time the plaintiff was exposed to the conduct – tips strongly against the Plaintiff here.  According to the Amended Complaint, the Plaintiff broke off her relationship with Defendant Nuschy in March 2005, and was terminated in late May 2005.  Thus, at the very longest, the Plaintiff was exposed to Defendant Sparaco's disapproval and movement restrictions for less than 90 days.

everyday society that no reasonable person could find such behavior to be "utterly intolerable." The fact that such attention and benefits were received from one's manager at work might add some additional taint of impropriety to the conduct, but not nearly enough to rise to the level of rendering the conduct "utterly intolerable in a civilized society." Accordingly, Defendant Sparaco is entitled to dismissal of the claim against him as well.

### C. Invasion of Privacy

To state a claim for invasion of privacy under Colorado law arising from the disclosure of private facts, the Plaintiff must allege: (i) that the fact disclosed was private in nature; (ii) that the disclosure was made by Defendant Dasko to the public; (iii) that the disclosure was one which would be highly offensive to a reasonable person; (iv) the disclosed fact was not of legitimate concern to the public; and (v) that Defendant Dasko disclosed the fact with reckless disregard of the private nature of the fact disclosed. *Doe v. High-Tech Institute, Inc.*, 972 P.2d 1060, 1065 (Colo. App. 1998).

The Plaintiff's response to Defendant Dasko's argument relies not specifically on the allegations in the Amended Complaint, but on an affidavit by the Plaintiff adding new details not found in the Amended Complaint. Because this Court's review on a Motion to Dismiss is limited to those facts asserted in the Amended Complaint, the Court disregards the Plaintiff's affidavit, and examines only that which is alleged in the Amended Complaint. On this issue, the Amended Complaint is quite brief: it alleges that the Plaintiff met with Defendant Dasko "privately and in confidence, to discuss issues going on in Plaintiff's life," *Docket* # 22, ¶ 9; and that "Defendant Dasko breached confidences and informed Defendant Nuschy [ ] of the material aspects discussed" with the Plaintiff, *id.* at ¶ 10.

9

The Court finds that the Amended Complaint fails to adequately allege that the information revealed by the Plaintiff to Defendant Dasko was "private in nature." The Amended Complaint describes the subject matter of the conversation as being only "issues going on in Plaintiff's life," but does not suggest that those issues were not otherwise public knowledge.[8] One might argue that paragraph 9 of the Amended Complaint alleges that the Plaintiff's communication to Defendant Dasko was "privately and in confidence," but that allegation merely describes the <u>manner</u> of communication, while the first element of the claim examines the <u>content</u>. Because the Amended Complaint does not adequately allege that the content of the information disclosed by Defendant Dasko was private in nature, the Plaintiff has failed to adequately state a claim for invasion of privacy.[9]

However, dismissal is inappropriate if the pleading defect is one that can be cured by amendment. Although the Court has not considered the substance of the Plaintiff's affidavit, the affidavit itself suggests that the Plaintiff might be able to plead additional facts in support of the

---

[8]Hypothetically, the "issues" the Plaintiff was worried about might have involved public allegations of criminal conduct against the Plaintiff, a family member, or close friend; a publicly-filed divorce proceeding, or similar type of civil action involving the Plaintiff, a family member, or close friend; a prominent and publicly-known employment or personal dispute in which the Plaintiff was entangled, etc. Because these hypothetical examples all involve publicly-known issues, the Plaintiff's discussion of these problems with Defendant Dasko would not necessarily involve the conveyance of information that is "private in nature." *See e.g. Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 377 (Colo. App. 1997).

[9]The Court need not reach the issue of whether the Amended Complaint adequately pleads the remaining elements. However, the Court does note that under Colorado law, the second element – dissemination of the information to the public – requires an allegation of facts showing that Defendant Dasko disclosed the information "to the public in general or to a large number of persons, as distinguished from one individual or a few." *Robert C. Ozer*, 940 P.2d at 377. Although the courts recognize that "public disclosure may occur where the defendant merely initiates the process whereby the information is eventually disclosed to a large number of persons," *id.* at n 7, allegations of facts to that effect would be necessary in any restated claim.

claim.  Accordingly, the Plaintiff will be granted 10 days in which to file a Second Amended

Complaint that adequately pleads an invasion of privacy claim against Defendant Dasko.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant Nuschy's Motion to Dismiss **(# 4)** is **DENIED AS**

**MOOT**.  Defendant Sparaco's first Motion to Dismiss **(# 8)** is **DEEMED WITHDRAWN.**

Defendant Sparaco's second Motion to Dismiss **(# 27)** is **GRANTED**, and the Plaintiff's claim

for outrageous conduct against Defendant Sparaco is **DISMISSED**.  There being no other claims

asserted against Defendant Sparaco, the caption of this case is **AMENDED** to omit Defendant

Sparaco.  Defendants Dasko's Motion to Dismiss **(# 29)** is **GRANTED IN PART**, insofar as the

Plaintiff's claim for outrageous conduct against Defendant Dasko is **DISMISSED** and insofar as

the Court finds that the Plaintiff has failed to adequately state a claim for invasion of privacy, and

**DENIED IN PART**, insofar as the Plaintiff may file a Second Amended Complaint within 10

days of the date of this Order, pleading a sufficient claim for invasion of privacy.  If no such

Second Amended Complaint is filed, the invasion of privacy claim against Defendant Dasko will

be dismissed.

Dated this 22d day of August, 2007

**BY THE COURT:**

*Marcia S. Krieger*
_____

Marcia S. Krieger
United States District Judge

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

United States Court of Appeals,Tenth Circuit.
Michael Mason DONOHUE, Walter Rice and
Bonnie Rice, Plaintiff-Appellants,
v.
Gerald HOEY, individually former chief of the City
of Montrose Police Department;  Thomas Chinn,
individually;  and City of Montrose, Colorado,
Defendant-Appellees.
No. 02-1405.

Sept. 21, 2004.

**\*343** J. Keith Killian, James P. Guthro, Grand
Junction, CO, for Plaintiffs-Appellants.
David L. Masters, The Masters Law Firm, L.L.C.,
Montrose, CO, Earl G. Rhodes, Michael Joseph
Grattan, III, Michael Paul Forrest, Younge &
Hockensmith, Grand Junction, CO, Christina M.
Habas, Joseph Thomas Vanhorn, Bruno, Bruno &
Colin, PC, Denver, CO, for Defendants-Appellees.

Before KELLY, HARTZ, Circuit Judges, and
CASSELL, District Judge. [FN*]

> FN* The Honorable Paul G. Cassell, United
> States District Judge for the District of Utah,
> sitting by designation.

**\*344 ORDER AND JUDGMENT**[FN**]

> FN** This order is not binding precedent,
> except under the doctrines of law of the case,
> res judicata, and collateral estoppel.   The
> court generally disfavors the citation of orders
> and judgments;  nevertheless, an order and
> judgment may be cited under the terms and
> conditions of 10th Cir. R. 36.3.

CASSELL, District Judge

**\*\*1** Four days before Thanksgiving 1993, Buffy Rice
Donohue disappeared.   Eighteen months later her
slain body was found abandoned in a wooded area in
the neighboring county.   During the time Buffy was
missing, law enforcement officials in Montrose,
Colorado, investigated her disappearance, but the
investigation left much to be desired.   Outraged by
shortcomings and misconduct in the investigation,
Buffy's parents, Walt and Bonnie Rice, and her
husband, Mason Donohue, (collectively "the Rices")
sued various members of the Montrose police force and
the City of Montrose itself. Although the Rices did not
blame the defendants for Buffy's death, they alleged
that the investigation was so deficient that it violated
their federal and state constitutional and statutory
rights. After several years of litigation, the defendants
moved for summary judgment, which the district court
granted.   On appeal, the Rices claim that summary
judgment was improper in light of the evidence they
offered.   We agree with the district court and affirm.

## I. BACKGROUND

Because this case is before us on appeal from a district
court's decision granting summary judgment, "we
review the district court's grant of summary judgment
de novo, applying the same legal standard used by the
district court." [FN1]   "When applying this standard, we
view the evidence and draw reasonable inferences
therefrom in the light most favorable to the nonmoving
party." [FN2]   Applying this standard, we consider the
facts of the case as follows.

> FN1. *Simms v. Okla. ex rel Dept. of Mental
> Health & Substance Abuse Servs.,* 165 F.3d
> 1321, 1326 (10th Cir.1999).

> FN2. *Id.*

On Sunday afternoon, November 21, 1993, Buffy Rice
Donohue left home to run a few errands.   Several
hours later, she had not returned home, and her family

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

began to worry. They soon discovered Buffy's locked car in a Wal-Mart parking lot. The Rices promptly filed a missing person report.

The Rices' biggest complaint about the subsequent investigation is that the police missed the most obvious suspects: Evonne Haley and David Middleton. In the Rices' view, these individuals were the prime suspects right from the start. Months prior to Buffy's disappearance, Buffy and Mason Donohue had worked with Haley at a local Sizzler's and had socialized together outside of work. At some point, Haley moved in with a man named David Middleton, who had moved to Montrose from Florida. There he had been charged with the kidnaping and sexual assault of a teenage girl and was ultimately convicted for false imprisonment and aggravated assault. At the time of Buffy's disappearance, he was a prime suspect in the investigation, although he would never face charges for her death. During the course of the investigation he moved to Reno, Nevada, where he was later convicted for the slaying of two girls.

*A. The Leads*

Beginning the day Buffy disappeared, leads started coming in that pointed to Haley and Middleton, but the police department was unresponsive. That afternoon**345** one of Buffy's friends, Annie Bercillio, saw Buffy in a car with a woman whose description matched Haley's. Bercillio told another friend, Noreen Cassidy that she had seen Buffy that day, and Cassidy relayed that lead to the police department. Cassidy spoke personally with Lieutenant Tom Chinn of the Montrose Police Department, the lead investigator and a defendant in this case. She informed Lieutenant Chinn that Bercillio had seen Buffy with Haley, but Lieutenant Chinn did not contact Bercillio or otherwise follow up on the lead. In fact, when Bercillio herself called the police department later that evening to report what she had seen, the police dispatcher responded that they were not taking calls on that case until after Buffy had been missing for

twenty-four hours. Mrs. Rice also called the police that same evening, but in spite of these reports that Bercillio had information about Buffy's disappearance, no one contacted Bercillio that evening to find out what she knew.

**\*\*2** Around midnight that night, Cassidy witnessed another startling event that pointed to Haley and Middleton. She was working at a convenience store across the street from the Haley/Middleton apartment. From there she had a clear view of the apartment and saw Middleton and Haley moving bags to their car. The most startling detail was that one bag was so large and heavy that Middleton had to carry it with both arms wrapped around it. Cassidy reported that the bag was big enough to have held a body.

The next morning, Monday, November 22, Cassidy called Bonnie to report what she had seen, and both of them called the police. Also that day, Haley's daughter, Natasha Hunter, told the police that Buffy had been in her mother's apartment the night before. Then, two women, Becky Dowden and Vicki Juliano Underwood, appeared at the police station to report that they had seen Buffy the day before at Wal-Mart with a blonde lady in a red sports car. These women were not questioned at that time; instead, they were asked to go home and prepare a written statement and then return their statements to the police department. They did this, but it is unclear from the record what happened to the statements. The record contains an undated, handwritten statement, signed by both women. Because the statement is undated, it is unclear when it was delivered to the police department, although the Rices claim it was not until December 10, 1993, which meant that the police would not have had the statement when they later administered inconclusive polygraph examinations to Haley and Middleton.

Two days later, on the 24th, another girl, Holly Samples, called Crime Stoppers to report that she had seen Buffy at Wal-Mart the day before. According to Samples, Buffy had just put some items into her car

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

when a blonde woman approached her, and the two drove off in the woman's red car. Two weeks passed before anyone followed up with Samples, and she made a statement at that time. Only after Buffy's body was found a year later did Lieutenant Chinn call to say he had lost her statements and to ask her to make another statement. She added her written statement to the statement made by Dowden and Underwood.

*B. The Investigation*

In light of the undisputed leads, the Rices argue police investigation was inadequate. They claim that the police did not contact Haley or Middleton during the earliest stages of the investigation, but the record contains undisputed evidence that Lieutenant Chinn actually spoke with Haley*346 on November 22.[FN3] That same day someone at the Montrose Police Department ran a criminal background check on David Middleton through the National Crime Information Center (NCIC),[FN4] but that search was not documented.

> FN3. Inquest into the Death of Buffy Rice Donohue at 442 (R. at 2077).

> FN4. Dep. of Thomas E. Chinn of Oct. 17, 2000, at 221-22 (R. at 1830).

Two days after Buffy's disappearance, Tuesday, November 23, the police went to the Middleton/Haley apartment to investigate a potential lead. Donohue reported that a screen at the Middleton/Haley apartment had been pushed outward and that black and bloody marks were left. In response to this report, Lieutenant Chinn, and two other officers, Kevin Walters and Diana Curtis, went to the apartment. What happened next is disputed. Donohue and other witnesses report that they saw the officers taking photographs and scraping paint samples into a plastic bag.[FN5] The normal procedure for handling such evidence would have been to place the photographs and paint samples into an evidence locker or with the case file. However, neither the evidence locker nor the case file contains any photographs or samples from the investigation of the Middleton/Haley apartment.

> FN5. Dep. of Michael Mason Donohue of Sept. 27-28, 2000, at 379-30 (R. at 1867); Dep. of Evonne Ione Haley of July 12, 2000, at 208 (R. at 1875); Videotaped Dep. of Natacha Hunter at 141-42 (R. at 1962-63).

**3** The police officers all explain this omission by claiming they did not collect evidence at the Middleton/Haley apartment. Officer Walters was at the patrol car talking to Donohue during the investigation and took neither samples nor photographs. Although he admits photographs might have been taken, he never saw them.[FN6] Officer Curtis does not recall taking any photographs, and she states that the mark on the window did not look to her like blood.[FN7] Lieutenant Chinn reports that his first impression was that the mark on the window was a bloodstain, but that upon closer inspection he realized the substance was not blood but paint.[FN8] Lieutenant Chinn testified at the Coroner's Inquest that he was so convinced that the substance was paint that it was not necessary to run a chemical test, so samples were not taken.[FN9]

> FN6. Dep. of Kevin T. Walters of Oct. 10, 2000, at 228-29 (R. at 1811).

> FN7. Dep. of Diana Ruth Curtis of Oct. 12 & 16, 2000, at 172 (R. at 1802).

> FN8. Inquest into the Death of Buffy Rice Donohue at 454 (R. at 2080).

> FN9. Inquest into the Death of Buffy Rice Donohue at 454 (R. at 2080).

Some time after December 1, 1993, Lieutenant Chinn followed up on the lead from Noreen Cassidy that

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

Middleton and Haley had been seen taking bags to their car on the night of Buffy's disappearance. He asked Middleton about the bags, and Middleton responded that they were laundry bags and showed them to Lieutenant Chinn. Lieutenant Chinn inspected the inside of the bags but did not see any blood or hair. He apparently did not search inside the car.

The Rices claim that during this visit Lieutenant Chinn identified Cassidy as his informant and that as a result Cassidy felt threatened and had to move out of state. The only record evidence they offer in support of this fact is a newspaper article that quotes Cassidy for this information.[FN10] **\*347** Because the article does not lay a foundation that Cassidy had personal knowledge of what Lieutenant Chinn said to Middleton, it is inadmissible hearsay [FN11] and cannot be considered in reviewing the motion for summary judgment.[FN12] Accordingly, there is no evidence to support the conclusion.

> FN10. Lane Mills, *MPD Knew Donohue, Middleton Link 1st Day, Witness Indicates,* Montrose Daily Press, Oct. 23, 1995 (R. at 2034).

> FN11. Fed.R.Evid. 602.

> FN12. *See Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir.1995).

### C. The Waterdog Incident

In the meantime, frustrated by their perception that the investigation was lacking, the Rices took their own steps to find Buffy. On Friday evening, November 27, 1993, the Rices received a tip that Middleton and Haley were holding Buffy in a cabin on Waterdog Mountain. The next morning Bonnie contacted Lieutenant Chinn and asked him to investigate the lead. Lieutenant Chinn responded that Waterdog Mountain was not within his jurisdiction and that the

Rices should report the lead to the county sheriff. Lieutenant Chinn suggested that Walt follow the lead himself but refused to deputize him. He told Bonnie that at worst Walt could be charged with trespassing but that he would "take care of the charges." [FN13]

> FN13. Bonnie Aff. at 3 (R. at 1952).

With that assurance in mind, Walt, Donohue, another friend named Dan Slover, and a couple of other individuals went to Waterdog to follow up on the lead. It was after 11:00 p.m. when they went, and they saw an unidentified vehicle traveling with its lights turned off. A rifle was sticking out of the driver's window. When the driver saw Walt and the others coming, he threw his vehicle into reverse and slid into a ditch. Suspicious, Walt and the others surrounded the car to investigate. The driver was a man named Mike McBride who apparently had been out hunting. He was clearly frightened but consented to a search of his vehicle. Satisfied that McBride was not connected with Buffy's disappearance, Walt let him go.

**\*\*4** Three months later, Walt would be charged with felony menacing and false imprisonment for this incident. The Montrose police department made no effort to "take care of the charges," although the felony menacing charges were ultimately dropped. Since no one from the Montrose police department had intervened on his behalf, Walt followed his attorney's advice and pled no contest to the false imprisonment charge. The record is silent about whether Walt was ever fined or incarcerated for the offense, nor does it explain what happened with the charges against Donohue.

### D. The Search and the Pictures

A few days after the Waterdog incident, on December 1, 1993, the Rices hired Nelson Jennett as a private investigator. They did not realize at the time that he had close ties to the Montrose Police Department and

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

that he was reporting back to the department without the Rices' consent.   When the Rices realized this, they fired him on December 20, 1993.   That day, Jennett notified the police department by letter that he was no longer employed by the Rices but that "I would very much like to continue working with you in this extraordinary case."

This short-lived relationship would probably have gone without mention had the Rices' dismissal ended Jennett's investigation, but it did not.   On January 2, 1994, Jennett got a call from a man named Ken Newman, who was manager of the trailer park where Buffy and Donohue had lived.   Newman reported that during the previous **\*348** week, Buffy and Donohue's trailer had been broken into.   When he entered to investigate, he saw a roll of film just inside the door in a shoebox.   Newman continued that the trailer had been broken into again that morning and that when he entered he saw another roll of film, which he took back to his office;   he left the other roll of film in the trailer.

Jennett relayed this information to Lieutenant Chinn, who told Jennett to go to the trailer park and get the film from Newman and have it developed that day.   Motivated in part by a desire "to cooperate with the police department," Jennett went to the trailer park to get the film.   When Jennett arrived at the trailer park, Newman reported that the Donohues had moved out two or three months before and that he had been cleaning the place up to rent out again.   Newman gave Jennett the roll of film he had taken from the trailer and suggested that Jennett enter the trailer with the maintenance man to retrieve the other roll.

There is some dispute as to whether Newman had authority to let Jennett into the trailer.   The Rices claim they owned the trailer at that time,[FN14] but Jennett reports that Newman had told him he was cleaning the trailer to show it to prospective tenants.[FN15]   Once inside, Jennett observed that the trailer was completely empty, except for the roll of film which was sitting in the middle of the floor in a wicker basket.   Jennett had the film developed and delivered

the prints to Lieutenant Chinn;   he kept the negatives in his own file.

> FN14. Bonnie Aff. at 4 (R. at 1953).

> FN15. Jennett Dep. at 216 (R. at 1886).

**\*\*5** The rolls of film turned out to contain photographs from Buffy and Mason's honeymoon, including several nude photographs.   To the extent the photographs were relevant to the investigation, they should have been put in an evidence locker, but instead, Lieutenant Chinn kept them in an unlocked drawer in his desk.

The record is unclear exactly where the photographs went from Lieutenant Chinn's desk, but it is undisputed that the photographs got out from time to time.   Lieutenant Chinn claims he never "inappropriately displayed" the pictures, but admits he showed the nude photographs to others for "identification purposes" [FN16] to eight or nine individuals connected with the investigation, ostensibly motivated by the hope that "they could point me in a different direction for this investigation." [FN17]

> FN16. Chinn Dep. at 205 (R. at 1828).

> FN17. *Id.* at 200-202 (R. at 1827);   *see also* Sellers Dep. at 103-106 (R. at 1845).

In addition to these so-called "appropriate" displays, a number of disclosures had no ostensible relation to the investigation.   For example, one officer, Steve Keep, whose office was near Lieutenant Chinn's, testified that he once overheard Lieutenant Chinn and others in his office laughing.[FN18]   When he went in the office to see what was going on, he saw the nude photographs lying on Lieutenant Chinn's desk.   The situation left him with the impression that Lieutenant Chinn and the others were laughing at the photographs.   Another woman, Crystal Black, who worked at the Montrose County Sheriff's Department, stated that two

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

uniformed patrolmen from the Montrose Police Department came to the sheriff's office to see one of her coworkers.[FN19]   The officers held several nude photographs of Buffy and were laughing **\*349** and making crude comments about them, referring to them as if they were pornography, and making disparaging remarks about Buffy's character.

FN18. Keep Dep. at 42-46 (R. at 1851).

FN19. Black Aff. at 1 (R. at 1992).

Lane Mills, a reporter, also claims to have spoken to confidential sources who claimed the pictures were inappropriately displayed.   She reports that city manager Ted Barkley felt "relieved he never saw the photographs" and "that they were improperly handled." [FN20]

FN20. Mills Dep. 31-34 (R. at 1990).

On January 6, 1994, the Rices learned the police had these photographs.  Mason promptly asked Lieutenant Chinn to return the pictures, but he refused, claiming they were evidence in the case.  The pictures were finally returned, but it was not until October of 1995 that the Rices had some idea about what was being done with the photographs.  It was then that reporter Lane Mills told Bonnie about what she had learned.

The Rices did nothing about the disclosures until almost a year later, when on September 11, 1996, they filed a complaint with the Victim Rights Act Subcommittee of the Colorado Victims' Compensation and Assistance Coordinating Committee.  On January 21, 1997, the subcommittee issued its report, finding a number of ways that the Rices' victims rights had been violated.   Specific to the pictures, the committee concluded that the police department was at fault for not logging the pictures into evidence, which created "an opportunity for the pictures to be seen by personnel other than the officers investigating the case," but it

was "unable to determine what transpired regarding the allegations that the pictures were passed among Montrose Police Department officers and coworkers." [FN21]

FN21. Report of Colorado Victims' Compensation and Assistance Coordinating Committee to Chief Gary Mecham (Jan. 21, 1997) at 8-9 (R. at 2001-2) (hereinafter "Victims Rights Committee Report").

### E. Bonnie's Arrest

**\*\*6** In the meantime, the police department took a number of steps that in hindsight may have been counterproductive.   On February 21, 1994, Bonnie had gone with a friend named Ed Gullette to talk with Haley and Middleton at their apartment.   Bonnie claims that the two stood in the doorway, talking with Haley, when Middleton came out with a shotgun and threatened them.   It is unclear whether Bonnie was ever inside the house, but she was subsequently charged with criminal trespassing.

The Rices note four troubling details about this trespassing charge that they claim are evidence of an improper motive.   First, the officer who came to the apartment to investigate refused to take a statement from Bonnie that she had not gone inside the apartment but had been threatened by Middleton. Second, the police charged Bonnie but apparently did not charge Gullette.  In a recorded phone conversation between Haley and Bonnie, Haley claims that the police asked her to bring charges against Bonnie but not Gullette.   Third, although months had gone by without any legal action for the Waterdog incident, charges were filed against Walt and Bonnie within three days of each other in March of 1994.   Finally, the Rices claim the charge against Bonnie was baseless because it was ultimately dropped on May 11, 1994.

### F. Asking the Suspect to Leave

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

The next troubling allegation is that, sometime after the encounter at the Middleton/Haley apartment, Lieutenant Chinn encouraged Middleton and Haley to leave **\*350** Montrose because the police department was receiving pressure to arrest Middleton. Bonnie and Haley both claim that Middleton told them he had been advised to leave town. However, the statements by Middleton recounting alleged statements by police officers are inadmissible hearsay and cannot be considered for summary judgment. Haley admits she was skeptical that Middleton was telling the truth. Nevertheless, Bonnie testified in deposition that Lieutenant Chinn and Officer Walters both admitted that Lieutenant Chinn had encouraged Middleton to leave town.

### G. The Reporters

On May 24, 1995, Buffy's bones were finally discovered in the mountains near Norwood, Colorado. The autopsy confirmed that she had been murdered. With all doubt eliminated about whether Buffy had been murdered, the Rices hoped the search for Buffy's murderer would intensify. However, the Rices continued to be dissatisfied with the investigation and became increasingly vocal in their condemnation of the police department. On October 5, 1995, the Rices and other Montrose citizens voiced their concerns about the police department at a city council meeting.

The defendants responded to the Rices' criticisms by criticizing the Rices in the local media. On October 16, 1995, Police Chief Hoey, Lieutenant Chinn, and Officer Curtis met with Associated Press writer Robert Weller at a local restaurant, apparently at Weller's request. Chief Hoey acknowledges that they talked about the Rices and their recent visit to the city council but also stated that they said nothing improper.[FN22] Beyond Chief Hoey's vague description of the interchange, however, no participant in that discussion has testified about what was said. The only direct evidence of what transpired is a phone call from an unidentified woman who overheard them talking about the Rices. Bonnie reports that the woman told her that the police officers said "they were just, like, really really tired of Walter criticizing the Montrose Police Department, and they were going to turn the tables on him."[FN23]

> FN22. Hoey Dep. 195 (R. at 1789).
>
> FN23. Transcript of Conversation Between Unidentified Woman and Bonnie Rice (R. at 2042) (punctuation added).

**\*\*7** Besides these accounts of the meeting, Nelson Jennett offers some circumstantial evidence of what was said. The same day that Weller met with the police officers, he phoned Jennett to get more information. The call only lasted about five minutes, but Weller told Jennett he was working on a story about the Rices and that Chief Hoey and Lieutenant Chinn had told him to contact Jennett. Jennett could not talk at the moment, but on October 18, 1995, they spoke again at greater length. During this second conversation, Weller told Jennett a number of details about the Rices, presumably in an effort to "prime the pump" and persuade Jennett to reveal information that he knew about the Rices. Jennett's notes reveal that Weller knew several sensitive details about the Rices, including (1) Walt and Buffy had used illegal drugs, (2) Walt took a lie detector test, (3) Buffy had attempted suicide once in the past, (4) Walt was arrested over ten years earlier for trespassing and assault, (5) Walt had been arrested in 1993 for domestic violence, and (6) Mason had brought another girl home the night Buffy disappeared.

Of course, the fact that Weller knew these details does not by itself incriminate the defendants in this case. As will be **\*351** discussed more fully below, liability will turn on whether the defendants revealed information in violation of the Constitution. Jennett claims that he did not know where Weller got his information and that all of these details were news to him. Some of the information, such as the 1993

18

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

arrest, would have been matters of public knowledge, and Weller told Walt that he got this information through the Colorado Bureau of Investigation (CBI). However, Walt reports that the CBI has no record of Weller running a search that would have revealed this information.

Other information, the Rices claim, could have been obtained only through the police. Furthermore, Walt told the police that he had used drugs with Buffy only because he thought it might help the investigation, and only because he believed the disclosure was confidential. Bonnie states that the reference to an alleged suicide attempt is an exaggerated reference to an incident that happened when Buffy was younger and that the only record of that incident is a sealed juvenile record. The reference to Donohue bringing a woman home is another exaggerated fact; Donohue returned home with a friend that the Rices hoped would help in the investigation, another detail the Rices had told to the police.

On October 21, 1995, Weller's article was published, repeating several of the details he had told Jennett. Although the article was similarly silent as to its sources for these details, it directly quoted Lieutenant Chinn as saying, "[The Rices] didn't call us and tell us that she might be in David Middleton's apartment. The question is why." [FN24] Besides the Weller article, one other consequence of the city council meeting was an independent assessment of the police department. This study was conducted by investigative consultant Terry A. Foulke, and the report of that study was issued in March 1996. In addition to the conclusions in the Foulke report, a number of city officials had misgivings about the police department.[FN25]

FN24. Robert Weller, *Murdered Woman's Father Withheld Vital Info, Cops Say,* The Daily Sentinel, Oct. 21, 1995 (R. at 2049).

FN25. *See, e.g.,* Haynes Dep. at 262-63 (R. at 2052-53) (former member of the city council

who informed City Manager Barkley about a number of problems he had observed, although the record does not indicate the nature of the problems Haynes observed); Expert Report of William H. Kain at 11 (former district attorney who claims city officials knew of the shortcomings before the Faulke report was issued) (R. at 2158).

*H. Procedural History*

**\*\*8** On May 23, 1996, the Rices filed their complaint in state court, which was subsequently removed to federal court. More than two years later, on October 9, 1998, they named Lieutenant Chinn for the first time in an amended complaint. One claim against Lieutenant Chinn-the outrageous conduct claim-was dismissed as untimely under the one year statute of limitations.

On March 26, 2001, the district court quashed the deposition of two reporters-Robert Weller and Stacie Oulton, another reporter who wrote about the Rices-and limited discovery from the two reporters to written questions. [FN26] As the grounds for this decision, the order cited a hearing held three days earlier. Almost a year later, on March 19, 2002, the court quashed discovery from the reporters, concluding that the reporters were protected by the reporter privilege.[FN27] Finally, on **\*352** August 7, 2002, the court granted summary judgment on all remaining claims.[FN28] The court concluded that the Rices had not supported their claims against Chief Hoey and Lieutenant Chinn for outrageous conduct and for violations of § 1983 and that they had likewise not established their § 1983 claims against the city. This appeal followed.

FN26. Order on Mots. of Mar. 26, 2001 (R. 979) (hereinafter "Mar. 26, 2001 Order").

FN27. Order Granting Mots. to Quash Subpoenas on Third Party Witnesses Stacey

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

Oulten and Robert Weller and Order Denying Mot. for Relief Pursuant to Rule 56(f) of Mar. 19, 2002 (R. at 2372) (hereinafter "Mar. 19, 2002, Order")

FN28. Mem. Op. and Order of Aug. 7, 2002 (R. 2378) (hereinafter "Summ. J. Order").

## II. ANALYSIS

The Rices present four issues for our consideration: (1) whether it was error to quash the depositions of Robert Weller and Stacey Oulton and to deny the Rices relief under Rule 56(f); (2) whether it was error to grant summary judgment on all § 1983 claims against Chief Hoey and Lieutenant Chinn; (3) whether it was error to grant summary judgment on all § 1983 claims against the City of Montrose; and (4) whether it was error to grant summary judgment on the state law tort claims against Chief Hoey and Lieutenant Chinn. We consider each issue in turn.

### A. Reporter Issue

[1] The Rices first claim that the district court improperly denied their efforts to depose Robert Weller and Stacie Oulton, who, as mentioned above, were reporters who might offer evidence of the defendants' unconstitutional and outrageous conduct. Defendants argue that this court may not review the district court's orders of March 26, 2001, and March 19, 2002, because (1) the orders were not included in the notice of appeal and (2) this court may not rule on this issue without hearing from the reporters, who have a stake in the outcome. Neither argument is persuasive.

First, since the Rices appealed from a final order, this court may review the related underlying orders. Defendants are correct that to appeal a district court order to this court, an appellant must file a notice of appeal with the district court clerk.[FN29] Such notice must, among other things, "designate the judgment, order, or part thereof being appealed." [FN30] This

requirement does not mean, however, that the notice must identify each discrete, underlying order, for "a notice of appeal which names the final judgment is sufficient to support review of all earlier orders that merge in the final judgment." [FN31] As we have previously explained:

FN29. Fed. R.App. P. 3(a)(1).

FN30. Fed. R.App. P. 3(c)(1)(B).

FN31. *McBride v. CITGO Petroleum Corp.,* 281 F.3d 1099, 1104 (10th Cir.2002); *Bowdry v. United Airlines, Inc.,* 58 F.3d 1483, 1489 n. 11 (10th Cir.1995).

**\*\*9** An appeal from a final judgment usually draws into question all prior non final orders and all rulings which produced the judgement. Thus, a failure of the notice of appeal to specifically refer to a preliminary or interlocutory order does not prevent the review of that order on appeal. Having appealed from the judgment, the appellant is free to attack any nonfinal order or ruling leading up to it.[FN32]

FN32. *McBride,* 281 F.3d at 1104 (quoting 20 Moore's Federal Practice P 303.21[3][c][iii] (3d ed.2001)).

Here, the Rices appealed from the district court's final judgment, which was entered on August 7, 2002. Since that order was a final order, the appeal of that order includes an appeal of the March 26, 2001, and March 19, 2002, orders.

**\*353** The defendants rely on our decision in *Citizens for Responsible Government State Political Action Committee v. Davidson,*[FN33] in which we declined to review an underlying order that was not included in either the notice of appeal or the docketing statement.[FN34] However, unlike this case, *Davidson* involved cross-appeals from four different cases rather

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

than an appeal from a final order in a single case.[FN35] This court concluded that the interlocutory order at issue there was not folded into any final order of dismissal.[FN36]   Accordingly, *Davidson* provides no basis for declining to review the orders the Rices challenge.

> FN33. 236 F.3d 1174, 1186 (10th Cir.2000).

> FN34. *Id.* at 1186.

> FN35. *Id.* at 1181.

> FN36. *Id.* at 1185-86.

Nor does the fact that the reporters are not parties to this appeal prevent this court from reviewing the March 26, 2001, and March 19, 2002, orders.   The defendants cite no authority for their claim that this court must hear from the reporters before it can rule on the reporter privilege issue, which was fully briefed and argued below.   Instead, they argue it is unsound policy to review such an order without giving the reporters a chance to be heard.   Because this court affirms the orders protecting the reporters, we need not resolve the procedural questions of whether appearance by the reporters is necessary, but must only conclude that this court can review the merits of the district court's orders.

Having found that we can review the merits of the orders, the issue before us is whether the district court abused its discretion [FN37] in deciding:  (1) the March 26, 2001, ruling that limited the Rices to posing written questions to the reporters;  (2) the March 19, 2002, ruling granting the reporters' motion to quash the written questions;  (3) and the March 19, 2002, ruling denying the Rice's motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure for leave to gather more evidence in opposition to the pending summary judgment motions.   We have repeatedly held that "[a]n abuse of discretion occurs only when the trial court bases its decision on an erroneous

conclusion of law or where there is no rational basis in the evidence for the ruling." [FN38]

> FN37. *See, e.g., Diaz v. Paul J. Kennedy Law Firm,* 289 F.3d 671, 674 (10th Cir.2002) ("discovery rulings are reviewed for an abuse of discretion");  *In re Grand Jury Subpoenas Dated December 7 and 8, Issued to Bob Stover, Chief of Albuquerque Police Department,* 40 F.3d at 1100 (reviewing motion to quash for abuse of discretion); *Jensen v. Redevelopment Agency of Sandy City,* 998 F.2d 1550, 1553 (10th Cir.1993) (reviewing Rule 56(f) motion for abuse of discretion).

> FN38. *See, e.g., Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1255 (10th Cir.2003).

[2] The Rices first argue that the March 26, 2001, order was an abuse of discretion because the judge did not articulate any reason for his ruling.   The difficulty we face in evaluating this claim is that the court makes it clear that its order was issued pursuant to reasoning developed at a hearing held three days earlier.[FN39]   It is settled that "when an appeal is based upon a challenge to any ruling or order, a copy of pages of the reporter's transcript at which the ruling or order ... are recorded must be included." [FN40]   Although the fact of the ruling was memorialized on March 26, 2001, the rationale underlying the ruling was explained at the March 23, **\*354** 2001, hearing.   The Rices have not certified the transcript of that hearing as part of the record on appeal, and without that transcript, we can only speculate as to the district court's reasoning.   The Rices cannot claim that the trial court abused its discretion without giving this court a chance to review the legal and evidentiary issues the district court considered.

> FN39. Mar. 26, 2001 Order (R. at 979).

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

FN40. *McEwen v. City of Norman, Okl.,* 926 F.2d 1539, 1550 (10th Cir.1991).

**\*\*10** [3] The Rices' second claim is that the district court erred in its finding that Oulton and Weller were entitled to the reporter's privilege under *Silkwood v. Kerr-McGee Corp.*[FN41] The difficulty with this argument is that the Rices seem to agree the district court applied the correct legal standard, arguing only that it erred in applying the standard. The applicability of *Silkwood* was extensively briefed, and the district court made the express "finding and conclusion that the plaintiffs have failed to make the showing necessary to overcome the privilege relied on by the motions."[FN42] The Rices never explain how the district court's application of *Silkwood* was an abuse of discretion, so we must affirm the court's decision to quash the reporter subpoenas.

FN41. 563 F.2d 433 (10th Cir.1977).

FN42. Mar. 19, 2002, Order (R. at 2372).

[4] Since the reporter depositions were the only basis for seeking relief under Rule 56(f), the district court properly denied that motion. Accordingly, we affirm that ruling as well.

*B. Section 1983 Claims*

The Rices argue next that the district court erred in concluding that Lieutenant Chinn and Chief Hoey's conduct during the investigation of Buffy's disappearance and murder did not violate the Rices' constitutional rights. Although the Rices presented below a broad range of evidence in support of their constitutional claims, the district court granted summary judgment for the defendants because none of the facts established a constitutional violation. We review de novo and can affirm only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[FN43]

FN43. *Hammons,* 348 F.3d at 1254.

In general, to establish a constitutional claim under § 1983, a plaintiff must prove four elements: "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of [law]."[FN44] However, even if a viable constitutional claim exists, a number of legal doctrines may preclude recovery for those violations. In this case, the relevant limiting principles are the statute of limitations, qualified immunity, and vicarious liability.

FN44. *Summum v. City of Ogden,* 297 F.3d 995, 1000 (10th Cir.2002) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)).

First, a § 1983 claim is subject to a statute of limitations. Because Congress did not specify a statute of limitations on § 1983 claims, "the forum state's personal injury statute of limitations should be applied to all § 1983 claims."[FN45] Because no Colorado statute of limitations expressly applies to personal injury actions, this court has previously looked to the Colorado residual statute of limitations,[FN46] which provides for a two-year statute of limitations.**\*355** [FN47] This court has stated that "[s]ection 1983 claims accrue when the plaintiff knows or has reason to know of the injury that is the basis of the action."[FN48] Accordingly, summary judgment is proper on § 1983 claims that the Rices had cause to know of more than two years before they filed their complaint.

FN45. *See also Pittsburg County Rural Water Dist. No. 7. v. City of McAlester,* 346 F.3d 1260, 1277 (10th Cir.2003); *Blake v. Dickason,* 997 F.2d 749, 750 (10th Cir.1993).

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

FN46. Colo.Rev.Stat. § 13-80-102(1)(i).

FN47. *Blake,* 997 F.2d 749; *McKay v. Hammock,* 730 F.2d 1367, 1370 (10th Cir.1984); *see also Riel v. Reed,* 760 F.Supp. 852, 854-855 (D.Colo.1991).

FN48. *Workman v. Jordan,* 32 F.3d 475, 482 (10th Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995).

The Rices argue that this court cannot consider the statute of limitations in ruling on their claims because summary judgment was not granted below on this ground. However, this court can affirm for any reason that is supported by the record and the law.[FN49] Thus, if we find that the Rices had reason to know of conduct more than two years before they filed their complaint, summary judgment must be affirmed.

FN49. *See, e.g., United States v. Corral,* 970 F.2d 719, 726 n. 5 (10th Cir.1992).

**\*\*11** Second, assuming the claims are timely, we must also determine whether they are barred by the doctrine of qualified immunity. Where a defendant police officer invokes the doctrine of qualified immunity (as Lieutenant Chinn and Chief Hoey do), the plaintiff must satisfy a "heavy two-part burden" to prove (1) "that the defendant's actions violated a constitutional or statutory right" and (2) "that the right at issue was clearly established at the time of the defendant's unlawful conduct."[FN50] This court has stated that for a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[FN51] Nevertheless, we must be careful not to require "too strict a factual correspondence."[FN52] In short, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' "[FN53]

FN50. *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir.2001).

FN51. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), *cited in Horstkoetter v. Dept. of Public Safety,* 159 F.3d 1265, 1278 (10th Cir.1998).

FN52. *Calhoun v. Gaines,* 982 F.2d 1470, 1474 (10th Cir.1992); *see also Bee v. Greaves,* 910 F.2d 686, 687 (10th Cir.1990).

FN53. *Id.* (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)); *see also Snell v. Tunnell,* 920 F.2d 673, 696 (10th Cir.1990) (quoting *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034).

Third, in addition to qualified immunity, the court must consider an additional defense with regard to the claims against Chief Hoey. With one exception, he did not participate in the conduct at issue and is sued solely under a vicarious liability theory. To prevail against a supervisor on such a theory, the plaintiff must establish that an " 'affirmative link' exists between the constitutional violation and either the [supervising officer's] personal participation, his exercise of control or direction, or his failure to supervise."[FN54]

FN54. *McKay,* 730 F.2d at 1374 (quoting *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)); *see also Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1187 (10th Cir.2001), *cert. denied,* 535 U.S. 1056, 122 S.Ct. 1914, 152 L.Ed.2d 824 (2002); *Worrell v. Henry,* 219 F.3d 1197, 1214 (10th Cir.2000), *cert. denied,* 533 U.S. 916, 121 S.Ct. 2521, 150 L.Ed.2d 693 (2001).

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

Here, the Rices articulate six theories that could establish constitutional violations: (1) denial of access to the courts, (2) **\*356** false arrest, (3) illegal search, (4) violation of their right to privacy, (5) harm to reputation, and (6) retaliation.   Thus, in order to impose liability for the alleged conduct, we must ask the following questions:

(1) Did Chief Hoey or Lieutenant Chinn's conduct violate a constitutional right?

(2) Did the Rices have reason to know of the conduct more than two years before they filed their complaint (May 23, 1996, for Chief Hoey and October 9, 1998, for Lieutenant Chinn)?

(3) Was that right clearly established?

(4) With respect to defendant Chief Hoey, was there an "affirmative link" between him and any violation?

The liability of each defendant for each of the Rices' six theories will be considered in turn.

### 1. Denial of Access to the Courts

The Rices' first constitutional claim is that improprieties during the investigation denied them their right of access to the courts.   The Rices maintain that defendants denied them access in four primary ways:   (1) by Lieutenant Chinn's refusing to gather evidence, pursue leads, or interview key witnesses;   (2) by labeling key witnesses (Noreen Cassidy, Dan Slover) as liars;   (3) by destroying evidence gathered at the Middleton/Haley apartment;   and (4) by telling Middleton and Haley to leave town without aggressively interrogating them.

**\*\*12** The district court rejected this claim, concluding that the officers' conduct did not amount to a denial of access to the courts and that, even if it did, the claim would be barred by qualified immunity as the right of access to the courts was not clearly established.   We agree with the district court that the Rices have not established a denial of access in this case.

[5] At the outset, except for the alleged destruction of evidence at the Middleton/Haley apartment discussed below, the denial of access claims are barred as to all defendants by the statute of limitations. All of the other conduct alleged in support of this claim happened before May 23, 1994, which is the earliest date that would allow the Rices to proceed against any party, and nothing indicates that the Rices did not know of those alleged violations at or around the time they happened.

[6] Unlike the Rices' other denial of access claims, however, their claim arising out of the investigation at the Haley/Middleton apartment is not barred by the statute of limitations.   Until July 1998, when Lieutenant Chinn testified at the coroner's inquest, the Rices had no reason to know that anything unusual had happened to the evidence gathered at the Middleton/Haley apartment on November 23, 1993. Accordingly, the statute of limitations does not bar this claim.

[7] On the merits of the claim, this court has long recognized a right of access to the courts.[FN55]  In 1984, we declared:   "The right of access to the courts is constitutionally protected.   Thus, conduct under color of law which interferes with that right gives rise to a cause of action under section 1983." [FN56]  Although the "right of access to the courts is neither absolute nor unconditional," [FN57] it is unnecessary to explore**\*357** every contour of this right here.   We need only recount two principles.   First, intentional, bad-faith destruction or concealment of evidence that burdens a plaintiff's ability to access the courts is an unconstitutional denial of access;   and, second, allegations that police were negligent in an investigation or that they negligently lost or destroyed evidence will not support a denial of access claim.

FN55. *See, e.g., McKay v. Hammock,* 730 F.2d 1367, 1375 (10th Cir.1984);   *Shaw v. Neece,* 727 F.2d 947, 949 (10th Cir.1984),

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

*cert. denied,* 466 U.S. 976, 104 S.Ct. 2358, 80 L.Ed.2d 830 (1984).

FN56. *McKay,* 730 F.2d at 1375.

FN57. *Schlicher v. Thomas,* 111 F.3d 777, 781 (10th Cir.1997) (quotation omitted).

Several of our opinions are instructive on these two principles. In *Wilson v. Meeks,*[FN58] the family of a man who was shot by police sued under § 1983. The plaintiffs claimed that the police denied them access to the courts by destroying incriminating evidence that would have helped their wrongful death claim, including photographs. Although the *Wilson* court recognized that destroying evidence could establish a denial of access claim,[FN59] none of the facts before it did.

FN58. 52 F.3d 1547 (10th Cir.1995).

FN59. *Id.* at 1557.

*Wilson's* analysis of the lost photographs is particularly instructive here. In *Wilson,* during the investigation of the shooting, the defendants took a number of potentially incriminating photographs. The film was sent to a developer but allegedly did not turn out. The pictures were then discarded. The family sued on the theory that loss of the incriminating photographs denied them access to the courts. This court agreed that the police may have negligently handled the pictures but noted that "plaintiffs do not allege they were purposefully destroyed." [FN60] We then said, "It may be that the Haysville Police were careless in their photography, but such behavior does not rise above negligence. It is well settled that merely negligent acts or omissions will not support a cause of action under section 1983." [FN61] Because the family had no evidence that the photographs had been purposefully destroyed, they could not prevail on this claim.

FN60. *Id.*

FN61. *Id.*

**13** Under *Wilson* the defendants did not deny the Rices' right of access to the courts because there is no evidence that the defendants intentionally destroyed evidence gathered at the Haley/Middleton apartment. To be sure, the parties legitimately dispute whether evidence was taken that day. The Rices offer testimony from witnesses who claim they saw Lieutenant Chinn and Officer Curtis at the apartment collecting samples of something that looked like blood and taking photographs of the scene. On the other hand, none of the police officers who participated in the investigation remember taking any samples. Lieutenant Chinn and Officer Curtis, the only two who actually saw the suspicious stains, testified that they had concluded the stain was paint, not blood, and that testing was unnecessary.

The Rices argue that, taking the evidence in a light favorable to them, we must infer that the evidence was gathered; and if the evidence was gathered but now cannot be found, we must infer that the evidence was destroyed. However, even if we resolve all factual disputes in the Rices' favor, the evidence does not support their assertion that Lieutenant Chinn *intentionally* destroyed evidence gathered that day. The only disputed fact here is whether samples or photographs were taken at the Middleton/Haley apartment. Resolving that dispute in favor of the Rices, we must conclude that samples and photographs were, in fact, taken. However, as to what happened to that evidence, the record is silent. Under *Wilson,* the lone fact that the missing evidence would have incriminated**358** the defendants does not support an inference that the defendants intentionally destroyed the evidence. [FN62] Of course, evidence collected that day might have been destroyed. But it just as easily could have been lost or misplaced. Under *Wilson,* we cannot infer that the samples and photographs were deliberately destroyed from the mere fact that they cannot be found. At most, the Rices can establish that

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

the evidence was effectively destroyed through police negligence, but under the cases cited above such a showing is inadequate to establish a denial of access claim. Without evidence that the defendants intentionally destroyed photographs and stain samples collected at the apartment, summary judgment on this claim was appropriate.

> FN62. *Wilson,* 52 F.3d at 1558.

### 2. Arrest for Improper Purpose

[8] The Rices' second § 1983 claim is that the defendants wrongly arrested and charged Walt with felony menacing and false imprisonment on March 4 and charged Bonnie with criminal trespassing on March 7, 1994. The district court concluded that the arrests were not a denial of access but did not consider whether they were unconstitutional false arrests.[FN63] However, both arrests happened more than two years before the Rices filed their initial complaint on May 23, 1996. Thus, both claims for false arrests are outside the statute of limitations for all defendants, and we affirm summary judgment on that basis.

> FN63. Summ. J. Order at 13.

### 3. Illegal Search

**\*\*14** [9] The Rices next claim the defendants violated their Fourth Amendment right to be free from unreasonable searches when Jennett entered their trailer and retrieved an undeveloped roll of film. Although we agree with the trial court that there was "no factual basis for a finding of an illegal search and seizure," [FN64] we need not discuss the merits of this claim since it, too, is barred by the statute of limitations. The Rices admit they knew the police had the film in January 1994 but claim they did not know specifically how the police obtained the film. However, because the film must have been found at the trailer, and because Mason Donohue had not given any permission for access to the film, the Rices had reason to know about this claim in January 1994. Accordingly, the statute of limitations on this claim began to run more than two years before the original complaint was filed. Accordingly, summary judgment was proper on this claim.

> FN64. *Id.* at 14.

### 4. Privacy

The Rices argue on appeal that the defendants violated their right to privacy by (1) passing around Buffy and Mason's honeymoon photographs and (2) revealing confidential information to Robert Weller. The trial court recognized that displaying the photographs violated Donohue's right to privacy. Nonetheless, the court ruled that the defendants were entitled to qualified immunity, concluding that a reasonable officer would believe that the film had been abandoned when Jennett found it in the Donohues' trailer. The court did not address whether the defendants' conversation with Robert Weller violated the Rices' privacy rights. We hold that summary judgment was proper on both claims.

The Supreme Court has recognized that the First Amendment privacy right includes an "individual interest in avoiding **\*359** disclosure of personal matters." [FN65] This court has explained the contours of this right:

> FN65. *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Mangels v. Pena,* 789 F.2d 836, 839 (10th Cir.1986).

Due process implies an assurance of confidentiality with respect to certain forms of personal information possessed by the state. Disclosure of such information must advance a compelling state interest which, in addition, must be accomplished in the least intrusive manner. Information is constitutionally protected

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

when a legitimate expectation exists that it will remain confidential while in the state's possession. The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material which the state possesses.[FN66]

FN66. *Mangels,* 789 F.2d at 839.

Because the defendants dispute even the allegation that they disclosed any information about the Rices, we must consider the following four issues: (1) whether the defendants disclosed information about the Rices; (2) whether the Rices had a legitimate privacy interest in the information; (3) whether the disclosure advanced a compelling state interest; and (4) whether the disclosure was accomplished in the least intrusive manner.

a. Displaying the Photographs

[10] The first basis for claiming a privacy violation is the Rices' claim that the defendants improperly disclosed the nude photographs of Buffy and Mason Donohue. The district court suggested that Donohue did not have a legitimate privacy interest in the film because "he failed to protect [it] from others who may discover it." [FN67] Even had there been a violation, though, the court also concluded that Lieutenant Chinn and Chief Hoey had qualified immunity because "[a] reasonable officer would believe the films had been abandoned when Jennett obtained them." [FN68] While we conclude that a privacy interest was violated and that qualified immunity would not apply in this case, we nevertheless affirm on other grounds.

FN67. Summ. J. Order 15 (R. at 2391).

FN68. *Id.*

(1) *Disclosure.*

**15** Resolving all factual disputes in the Rices' favor, we conclude for purposes of summary judgment that Lieutenant Chinn, and possibly others, disclosed nude photographs of Buffy and Mason Donohue. It is undisputed that the police department received two rolls of film that belonged to Buffy and Mason and that this film contained nude honeymoon pictures of Buffy and Mason. It is also undisputed that Lieutenant Chinn showed the photographs to numerous others connected with the investigation, purportedly for "identification purposes" and to get their help in the investigation.

In addition to these disclosures, Steve Keep saw the photographs lying on Lieutenant Chinn's desk after he heard people in his office laughing. The fact that the people in Lieutenant Chinn's office had been laughing coupled with the fact that the photographs were lying on his desk caused Keep to believe that Lieutenant Chinn and the others had been laughing at the photographs. Although Keep testified he could not be sure they were laughing at the photographs, the circumstantial evidence that gave him that impression could also reasonably support a jury's conclusion that Lieutenant Chinn and the others in his office had been laughing at the photographs. Crystal Black also stated that **360** two uniformed Montrose police officers showed her nude photographs of Buffy and made rude comments about Buffy and the photographs. One other individual, reporter Lane Mills, testified that the photographs had been improperly displayed, but her testimony is inadmissible on this issue since it lacks the foundation that she had personal knowledge of the disclosures.

(2) *Legitimate Expectation of Privacy.*

[11] Contrary to the district court's conclusion, Mason Donohue had a legitimate expectation of privacy in the photographs. As noted above, "The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material which the state possesses." [FN69] In *Slayton v.*

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

*Willingham,*[FN70] this court held that allegations that the police disclosed "highly sensitive, personal, and private photographs" stated a claim for a privacy violation.   The plaintiff in *Slayton* had been investigated for a crime, and in the course of that investigation police illegally seized several photographs that were allegedly "highly sensitive, personal, and private." [FN71]  The plaintiff complained that the defendants then showed these photographs to several of his friends.   Because the record before the court did not indicate the circumstances of the exhibition, the court clarified that the plaintiff would also have to establish "(a) he had a legitimate expectation of privacy in the photographs, and (b) his privacy interest outweighed the public need for their disclosure." [FN72]  It is significant that the privacy interest in the content of the photographs (i.e., the allegedly illegal disclosure) was distinct from the privacy interest in the area where they were seized (i.e., the illegal search).

FN69. *Mangels,* 789 F.2d at 839.

FN70. 726 F.2d 631, 635 (10th Cir.1984).

FN71. *Id.*

FN72. *Id.*

**16** Unlike the *Slayton* court, we know the nature of the photographs at issue, which were photographs of Donohue and his new bride naked on their honeymoon.   From these facts, it would appear that Donohue had a legitimate privacy interest in the photographs.

The district court reached the opposite conclusion, determining that Donohue no longer had a privacy expectation in the photographs since they were found in an apparently abandoned trailer home.   We do not need to reach the question of whether Donohue lost his expectation of privacy at the time the film was seized because he regained any expectation of privacy by asking the police to return the photographs to him. As soon as he learned the police had the pictures, he asked for them back.   He claims the police refused to return the film, and the police argue they had permission to keep the film as evidence in the case.   In either event, Donohue regained any lost expectation of privacy by asking for them back, and even if he allowed the police to keep them, they could only use the photographs for legitimate law enforcement purposes.  Furthermore, the police ultimately returned Donohue's pictures to him once the investigation was complete.   This evidence contradicts the district court's conclusion that the police reasonably believed no one had an interest in the photographs or that, as a matter of law, Donohue had lost his privacy interest in these intimate photographs.

(3) *Compelling State Interest*

We also conclude that Donohue has sufficiently established that the disclosures **361** did not advance any compelling state interest.   Lieutenant Chinn had no reason to leave such sensitive photographs lying on his desk for Steve Keep to see.   He admits that such photographs should have been kept in an evidence locker, which would have preserved the privacy interest in them.   Moreover, the circumstantial evidence suggesting that Lieutenant Chinn and the others were laughing at the pictures undercuts any assertion of display for a legitimate purpose. Likewise, we see no reason why the unidentified officers would have shown the pictures of Buffy to Black, who had nothing to do with the investigation-a point confirmed by their degrading references to a homicide victim.

(4) *Least Intrusive Means*

Finally, to the extent the disclosures were made to advance a compelling state interest, they were not made in the least intrusive means.   The only legitimate basis offered for disclosing the photographs

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

was to identify Buffy and to "point [Lieutenant Chinn] in a different direction for this investigation." [FN73] However, the defendants have not explained how these photographs would have given the investigators any meaningful direction.   While there is a state interest in identifying a crime victim, the defendants have articulated no reason why they could not have used more modest pictures of Buffy to identify her.   Thus, we must conclude that the disclosure of these photographs violated Donohue's right to privacy.

> FN73. Chinn Dep. 200-02, 205 (R. at 1827-28).

### (5) Qualified Immunity

**\*\*17** [12] Having found that Donohue's privacy right was violated, we now consider whether the respective defendants are liable for this violation.   The district court concluded that Chief Hoey and Lieutenant Chinn were protected by qualified immunity because "[a] reasonable officer would believe the films had been abandoned when Jennett obtained them." [FN74]   As explained above, however, circumstances changed when Donohue sought return of the photographs.   At that point, a reasonable officer would have understood that a privacy interest was being asserted.   Moreover, in light of *Slayton,* we conclude that the privacy right violated here was clearly established.   Under *Slayton,* a reasonable officer would have known that passing around naked photographs of crime victims for no legitimate purpose would violate constitutional privacy rights.   Thus, neither Lieutenant Chinn nor Chief Hoey is protected by qualified immunity.

> FN74. Summ. J. Order 15 (R. at 2391).

### (6) Individual Liability

Nevertheless, recovery from either of the individual defendants is barred by other doctrines.   Recovery from Lieutenant Chinn is barred by the statute of limitations.   Although the Rices learned that the police had the photographs in January 1994, they had no reason to know the pictures were being mishandled at that time or even in August 1994 when the pictures were returned.   However, the Rices acknowledge that in October 1995 reporter Lane Mills informed them of the mishandling of the pictures more than two years before any claims were filed against Lieutenant Chinn.

However, the Rices argue that they did not know the full extent of their injury until the Victim Compensation and Assistance Coordinating Committee had investigated the situation and reported on the violations.   Colorado law provides that crime victims may enforce compliance with various victims' rights by filing a complaint **\*362** with the Victim Compensation and Assistance Coordinating Committee, which "review[s] any such report of noncompliance" and can recommend that the state file suit on behalf of victims to enforce their rights. [FN75] The Rices filed such a complaint regarding the investigation of Buffy's death.   The committee investigated their allegations and concluded that the Rices' rights as victims had been violated.   Specific to the pictures, the committee concluded that the police department was at fault for not logging the pictures into evidence, which created "an opportunity for the pictures to be seen by personnel other than the officers investigating the case," but it was "unable to determine what transpired regarding the allegations that the pictures were passed among Montrose Police Department officers and coworkers." [FN76]   The Rices argue that until this report was issued, the Rices had no knowledge of the offense and that the statute of limitations should be tolled until January 21, 1997, when the Victims Rights Act Subcommittee issued its report.

> FN75. Colo.Rev.Stat. § 24-4.1-303(17).

> FN76. Victims Rights Committee Report 8-9 (R. at 2001-2).

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

We disagree. The fact that the Rices did not know the full extent of the disclosure does not change the reality that in October 1995 they had reason to know of the fact of disclosure. Thus, the statute of limitations on this claim accrued in October 1995, which bars the privacy claim against Lieutenant Chinn.

**\*\*18** [13] While the statute of limitations does not bar the claim against Chief Hoey since the original complaint was filed on May 23, 1996, less than two years after the Rices learned about the misuse of the photographs, summary judgment was nevertheless proper as to him because there is no "affirmative link" between him and the privacy violation. There is no evidence that he showed the photographs to anyone, that he approved of Lieutenant Chinn's use of the photographs, or that the violation was caused by a lack of supervision. Accordingly, we find that summary judgment was proper as to Chief Hoey on this claim.

b. Disclosure of Private Information to Reporter
Robert Weller

[14] In addition to the improper disclosure of the nude photographs, the Rices claim the defendants violated their privacy rights by releasing private information to reporter Robert Weller, such as information about a suicide attempt by Buffy.[FN77] Although the trial court did not directly consider this issue, we nevertheless affirm the grant of summary judgment because we find that the defendants did not violate the Rices' privacy rights.

> FN77. The Rices also claim that alleged disclosures to another reporter, Stacey Oulton, also violated their constitutional rights. However, the record evidence does not sustain such a claim. Moreover, any such disclosures were outside the statute of limitations.

(1) *Disclosure.*

The Rices base their privacy claim on an October 21, 1995, newspaper article written by Weller. However, because the defendants are liable for what *they* said, not for what Weller said or wrote, the fact that Weller published private information about the Rices potentially implicates the defendants only if he got his information from the defendants. If Weller published information that he could have gotten only from the defendants, then, construing the facts in the Rices' favor, it logically follows that the defendants were the source of that information.

**\*363** Although the defendants do not dispute that Chief Hoey, Officer Curtis, and Lieutenant Chinn met with Weller to discuss the Rice investigation, they contend that the Rices have not established that they were the source of Weller's information. However, the record contains sufficient evidence from which a jury could conclude Chief Hoey and Lieutenant Chinn were the source of Weller's information. Indeed, Weller's article identifies the police as its source.

Although the police did not reveal any of the particulars of their conversation in discovery, Weller opened a window on the conversation by contacting Nelson Jennett, whom the Rices had originally retained as a private investigator but later fired when they learned of his ties to the police department. Weller contacted Jennett for information about the case, and Jennett made detailed notes of their conversation. Weller informed Jennett that (1) Walt took a lie detector test in connection with the investigation, (2) Walt and Buffy had used illegal drugs, (3) Walt was arrested on various occasions for various offenses, (4) Mason had brought another girl home the night Buffy disappeared, and (5) Buffy had attempted suicide once in the past.

Some of these details could only have been learned from the police department. For example, the Rices explain that the reference to Buffy's attempted suicide refers to an incident that was part of a sealed juvenile record. Because that record was sealed, Weller could

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

only have learned this information from someone who, like the defendants, was privy to the sealed record. The other details are all details, such as Walt's drug use, that the Rices had shared with the police in confidence, believing the information would used only in the investigation. We find that there is enough evidence to go to a jury on whether the defendants were the source of the information that Weller relayed to Jennett, which Jennett recorded in his notes.

### (2) Legitimate Expectation of Privacy.

**\*\*19** Nevertheless, the fact that the police could have been the source of the information Weller relayed to Jennett does not mean that such disclosure was unconstitutional. Indeed, we conclude that this disclosure did not violate the Rices' right to privacy because they did not have a legitimate expectation of privacy in the information disclosed.

As noted above, the legitimacy of a privacy expectation turns on whether the Rices had a "legitimate expectation" that these details about them would "remain confidential while in the state's possession."[FN78] In *Mangels v. Pena,*[FN79] this court considered a case in which the plaintiffs were firemen who were investigated and fired because of their drug use. During the course of the investigation, they had signed statements regarding their drug use, and the information disclosed in those statements was subsequently released to the media. These statements were made only after signing the following statement: "These statement and answers to questions are given for departmental administrative purposes only, and shall be limited in use to the Department of Safety, the Civil Service Commission, or subsequent hearings relating to any disciplinary action."[FN80] We rejected the plaintiffs' argument that this statement created a legitimate expectation of privacy in the information they provided, concluding

FN78. *Mangels,* 789 F.2d at 839.

FN79. 789 F.2d 836.

FN80. *Id.* at 839 n. 3.

**\*364** Any limited assurances of confidentiality offered by Denver officials to the [plaintiffs] do not make a difference in this case. Rights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution. The legitimacy of individual expectations of confidentiality must arise from the personal quality of any materials which the state possesses. Allegations of a failure on the part of government officials to abide by their own assurances of confidentiality will not suffice to state a claim. *Any disclosed information must itself warrant protection under constitutional standards.*[FN81]

FN81. *Id.* at 839-40 (emphasis added; citations omitted)

Accordingly, while police assurances may give rise to an expectation of privacy in the colloquial sense, a plaintiff has a *constitutional* expectation of privacy only if the disclosed information itself warrants protection.

We recognize some tension between our 1986 decision in *Mangels* and our 1981 opinion in *Denver Policemen's Protective Association v. Lichtenstein.*[FN82] There a group of police officers sued a state court judge who allowed a criminal defendant to discover investigative files that they claimed contained private information. Not surprisingly, we held that confidential statements in a police investigative file could be discovered by a criminal defendant. However, in analyzing whether the disclosure violated the officers' constitutional privacy rights, we stated, "The expectation of privacy is found in the fact that the statements by officers taken in the course of investigation are made with the understanding that they are confidential and will not be used for other purposes."[FN83]

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

FN82. 660 F.2d 432 (10th Cir.1981).

FN83. *Id.* at 435.

**\*\*20** While this language arguably is in tension with our analysis in *Mangels,* it does not control our analysis in this case. This language in *Denver Policeman's Association* was dicta since the court "assum[ed] that the police officers have a legitimate expectation of privacy" but ultimately concluded that any interest they had was "overridden by a compelling state interest." FN84 Because the legitimacy of the privacy expectation was not dispositive, we had no reason to elaborate on what specific facts had given rise to the privacy right we assumed might exist. At best, the decision left the door open for future cases to establish a legitimate expectation of privacy in information contained in police reports. Four years later in *Mangels,* we declined to go through that door. While the *Mangels* court did not cite this specific language, it is clear that the *Mangels* court was aware of *Denver Policeman's Association,* citing it prominently in its analysis.FN85 To the extent these cases are in tension, we conclude that *Mangels* controls and hold that the Rices' understanding that disclosures to the police were confidential did not create a constitutional expectation of privacy.

FN84. *Id.* at 436.

FN85. *See Mangels,* 789 F.2d at 839 (citing *Denver Policeman's Association,* 660 F.2d at 435).

This conclusion does not end the analysis because *Mangels* contemplates that the information itself could warrant protection under constitutional standards. However, none of the information that defendants passed on to Weller warrants such protection. As noted above, the only information on the record that can arguably be attributed**\*365** to the defendants are the following details recorded in Jennett's notes of his

conversation with Weller: (1) Walt took a lie detector test in connection with the investigation, (2) Walt and Buffy had used illegal drugs, (3) Walt was arrested on various occasions for various offenses, (4) Mason had brought another girl home the night Buffy disappeared, and (5) Buffy had attempted suicide once in the past. None of these details create a legitimate expectation of privacy.

In general, for information to be protected, it must deal with facts that are intimate or personal.FN86 Plaintiffs cite no authority to support a conclusion that a plaintiff has a legitimate expectation of privacy in the fact that he took a lie detector test, and we know of none. Because this fact is neither intimate nor personal, we conclude that Walt does not have a legitimate expectation of privacy in the fact that he took a lie detector test.

FN86. *Id.*

We have already held that an individual does not have a legitimate privacy expectation in details about illegal drug use,FN87 so we cannot conclude that information regarding Walt and Buffy's illegal drug use was protected.

FN87. *Id.*

As for Walt's arrests, these are all matters of public record, so Walt has no privacy interest in them. As to the fact that Donohue brought another woman home the night Buffy disappeared, the Rices seem to conflate two issues. While Donohue may have a legitimate expectation of privacy in intimate information, the police apparently did not disclose any intimate information about Donohue. Rather, they only stated (and the Rices do not dispute) that Donohue brought a woman to the Rices home the night Buffy disappeared. The Rices' objection seems to focus on the insinuation rather than the factual disclosure itself. We conclude that Donohue did not have a legitimate expectation of

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

privacy in the fact that a woman accompanied him to his home because anyone could have seen them walking publicly together.

**\*\*21** The final revelation-that Buffy had once attempted suicide-is not protected since it is not something in which her parents or husband have an expectation of privacy. Courts have recognized that a state statute can seal records, thus creating a legitimate privacy expectation for a juvenile. However, we know of no authority-and the Rices cite none-for the proposition that *parents* have a legitimate expectation of privacy in their child's sealed juvenile record. To the contrary, at least one other court has held that "the statutory safeguards which prohibit public dissemination of information pertaining to youthful offender adjudications .... are designed solely to protect juveniles, and not their parents, from the social stigma of a prior criminal conviction." [FN88] While Buffy might have had a privacy interest in sealed juvenile records, her parents did not.

> FN88. *Soucie v. County of Monroe,* 736 F.Supp. 33, 35 (W.D.N.Y.1990).

In sum, we hold that even if the defendants had told Robert Weller the information he passed on to Nelson Jennett, none of the disclosures violated the Rices' right to privacy, and summary judgment was proper on this claim.

### 5. Reputation

[15] In addition to arguing police disclosure to Weller led to a privacy violation, the Rices also argue the disclosure unconstitutionally injured their reputation. The district court granted summary judgment **\*366** on this claim, concluding that the Rices had not shown injury to a tangible interest as required to prevail on a reputation claim. This court agrees.

State stigmatization of a private individual invokes due process liberty concerns.[FN89] However, without injury to some "tangible interest," harm to reputation alone does not create a constitutional cause of action. [FN90] To establish a cognizable constitutional injury, "a plaintiff must show that the damage to his reputation is combined with an injury to a right or status established by state law." [FN91] Put another way, the "right or status" in question must be "recognized and protected by state law" and then "altered or extinguished as a result of the state action complained of." [FN92]

> FN89. *See Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

> FN90. *Paul v. Davis,* 424 U.S. 693, 701, 711-12, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Doe v. Bagan,* 41 F.3d 571, 575 (10th Cir.1994).

> FN91. *Bagan,* 41 F.3d at 575.

> FN92. *Id.* at 576.

Of the various interests the Rices claim were injured, only one is a tangible interest that arguably could support a reputation claim: harm to Mr. Rice's "established business relationships." The Supreme Court has recognized a tangible interest in the "freedom to take advantage of ... employment opportunities." [FN93] But where the deprived interest is in a "future employment opportunity," that interest must have been "initially recognized and protected by state law." [FN94] We have held that "damage to 'prospective employment opportunities' is too intangible to constitute a deprivation of a liberty or property interest." [FN95] That is, where the stigma merely decreases a plaintiff's ability to engage in future work, there is no constitutional violation.[FN96] On the other hand, "present harm to ... established business

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

relationships" is sufficient to establish a constitutional claim.[FN97]

> FN93. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

> FN94. *Bagan,* 41 F.3d at 576 (quoting *Paul,* 424 U.S. at 711-12, 96 S.Ct. 1155).

> FN95. *Phelps v. Wichita Eagle-Beacon,* 886 F.2d 1262, 1268 (10th Cir.1989) (citing *Setliff v. Memorial Hosp. of Sheridan County,* 850 F.2d 1384, 1397 n. 18 (10th Cir.1988)).

> FN96. *See Martin v. Unified School Dist. No. 434, Osage County, Kan.,* 728 F.2d 453, 455 (10th Cir.1984).

> FN97. *Phelps,* 886 F.2d at 1268; *Corbitt v. Andersen,* 778 F.2d 1471, 1474-75 (10th Cir.1985).

**\*\*22** The Rices' primary theory is that the defendants conversation with Robert Weller sullied the Rices' reputation in the community, damaging Walt's "established business relationships" as a home salesman. However, no record evidence would allow a reasonable factfinder to conclude that established business relationships were injured. The strongest evidence for this claim is a single statement from Walt's affidavit:

As a salesman of pre-fabricated homes in a competitive market, my reputation in the community was vital to my ability to sell this product. My best earning history was before Buffy's disappearance. I never sold as much afterward, and now after more than 20 years in the business, I have had to leave that line of work. I have left sales in large part because of the reputation I have in the community as a result of the negative publicity unfairly created by the Montrose Police Department.

**\*367** While this statement arguably suggests harm to existing business relationships, it is not enough to survive a well-plead summary judgment motion. Without any specific tangible evidence of actual harm to established business relationships, a conclusory assertion cannot sustain such a claim.

Not only is there an absence of evidence that Walt's business relationships were hurt, there is record evidence that his established business relationships were *not* hurt. When asked in deposition what harm he had suffered in his business, Walt named a single customer who had recently purchased a home from him. Although the customer reported she had heard inflammatory statements about Walt, she did not back out of the transaction.[FN98] Had she or any other of Walt's customers actually backed out of a deal, Walt might be able to prevail on this claim. But without such evidence, summary judgment was proper as to the Rices' § 1983 claims based on reputation injury.

> FN98. Walt Dep. 441-42 (R. at 1918-19).

### 6. Retaliation

[16] The Rices' final § 1983 claim is that defendants retaliated against them for exercising their First Amendment rights by ruining the Rices' reputation. The district court did not separately consider this claim, apparently handling it with the reputation issue. We conclude that while there may remain a question as to whether any injury to the Rices could have possibly chilled a person of ordinary firmness from exercising her First Amendment rights, summary judgment is still appropriate because plaintiff failed to properly and specifically raise this issue in the district court. It is well-established that this court does not consider issues which are raised for the first time on appeal except for a review for plain error resulting in manifest injustice.[FN99] Therefore, having reviewed the record and seeing no plain error, we find that plaintiffs waived this issue by failing to raise and preserve it in prior proceedings.

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

FN99. *See e.g. U.S. v. Dewitt,* 946 F.2d 1497, 1499 (10th Cir.1991) ("We will not consider issues which are raised for the first time on appeal unless a party demonstrates an impediment which prevented raising the argument below."); *U.S. v. Chavez-Marquez,* 66 F.3d 259, 261 (10th Cir.1995) (finding that all issues not raised with the district court are waived on appeal except for a review for plain error resulting in manifest injustice).

### C. City § 1983 Liability

[17] The Rices claim that, not only are Chief Hoey and Lieutenant Chinn liable for the constitutional violations, but also the City. We agree with the district court below that the city is not liable for any constitutional violations in this case.

**\*\*23** To hold a municipality liable under § 1983, a plaintiff must also establish (1) that a municipal employee committed a constitutional violation and (2) that the municipality's policies are the "moving force behind the constitutional violation." FN100 Such policy may be established either by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." FN101 In the absence of a formal policy, a policy may be inferred from a well-established pattern of conduct.**\*368** FN102 Where the constitutional violation was caused by a city's failure to adequately train its officers, the city will be liable "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." FN103

FN100. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611

(1978); *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 782 (10th Cir.1993).

FN101. *Monell,* 436 U.S. at 694.

FN102. *See, e.g., Anaya v. Crossroads Managed Care Systems, Inc.,* 195 F.3d 584, 592-93 (10th Cir.1999); *Pierce v. Delta County Dep't of Soc. Servs.,* 119 F.Supp.2d 1139, 1155 (D.Colo.2000) (citing *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)).

FN103. *City of Canton, Ohio,* 489 U.S. at 389, 109 S.Ct. 1197.

At this juncture, the only alleged violation we need to consider is the privacy violation associated with the nude photographs. The other claims are barred for the reasons stated above. Either they are barred by the statute of limitations (the claims against the city were filed in the same pleading as the claims against Chief Hoey) or they do not support our finding that a right was violated. Unlike those other claims, we concluded above that the claim against Chief Hoey for improper disclosure of the photographs was not barred by the statute of limitations. Since Chief Hoey and the City were both named in the same complaint, this claim is not barred against the city either.

Nonetheless, because the Rices cannot establish that the photograph disclosure was driven by some city policy, we affirm summary judgment as to this claim against the City. The primary evidence supporting liability by the City is the Foulke report. That report concluded that "[a] significant number of policies in the [police department] manual are not in conformity with modern day law enforcement standards." FN104 This general conclusion is not enough to establish a general failing. In order to prevail against the city, the Rices must establish specific shortcomings that can be identified as the cause of the violation. The Rices claimed below that the Foulke report specifically found that the department suffered from "inadequate

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

evidence maintenance procedures," [FN105] but the basis for that conclusion was contained in "Section III" of the report,[FN106] which they have not included in the appellate record.  Without evidence of what the policy was, we cannot conclude that the policy was the moving force behind the violation.

> FN104. Foulke Report 62 (R. at 1834).

> FN105. Pls.' Resp. to Def. City of Montrose's Mot. for Summ. J. and Req. for Hr'g 61 (R. at 1649).

> FN106. *Id.*

The other evidence cited in support of this claim also falls short because it supports only the fact of a constitutional violation, not the conclusion that the city's policy was a moving force behind any violation.  For example, the Colorado Victims Rights Subcommittee concluded that the pictures were improperly handled, but offered no opinion as to whether the Montrose Police Department policy regarding evidence was itself deficient.  To the contrary, it suggests that the department may have had a policy of returning evidence within five days, in which case the policy could not have caused the violation but would itself have been violated.[FN107]  Similarly, an independent expert concluded that the evidence procedures were below "standard police procedures," but he reached no conclusion as to whether the deficiency was in the department policy itself or in the individual officers' adherence to the policy. [FN108]  In short, the plaintiffs**369** have offered no evidence that the City's policy caused the violation.

> FN107. *See* Victims Rights Committee Report 9 (R. at 2002).

> FN108. Letter from L.M. Smith to Keith Killian 5, ¶ 5 (R. at 2185).

**24** [18] The Rices further argue that even if the policy itself was adequate, the city is liable for failing to train the officers on that policy.  However, while the Rices have challenged Montrose City's training program generally, they have shown no evidence that training with regard to evidence collection and preservation was deficient, much less that the failure to train amounted "to deliberate indifference to the rights of persons with whom the police come into contact."[FN109]

> FN109. *City of Canton, Ohio,* 489 U.S. at 389, 109 S.Ct. 1197.

Accordingly, we find that summary judgment was proper on the privacy claim rising out of the nude photographs.

### *D. Outrageous Conduct Claims*

[19] Having addressed the Rices' § 1983 claims, we now turn to their tort claims arising under Colorado law.  The district court rejected these claims, concluding that the claim against Lieutenant Chinn were barred by the statute of limitations and that, in any case, the Rices had not offered enough evidence to support an outrageous conduct claim.  We affirm, concluding that most claims are barred by the applicable statute of limitations and that the few surviving claims do not amount to outrageous conduct.

Colorado law imposes a one-year statute of limitations on "[a]ll actions against ... police officers or any other law enforcement authority." [FN110]  In this case, this statute arguably conflicts with another statute, which imposes a two-year statute of limitations for outrageous conduct claims.[FN111]  We follow the analysis of the Colorado Supreme Court in choosing which of two apparently conflicting statute of limitations to apply:  (1) a specific statute preempts a general statute;  (2) a later statute is given effect over an earlier statute;  and (3) a longer period of limitations should prevail where two statutes are arguably applicable.[FN112]

109 Fed.Appx. 340
109 Fed.Appx. 340, 2004 WL 2095661 (C.A.10 (Colo.))
**(Cite as: 109 Fed.Appx. 340)**

FN110. Colo.Rev.Stat. § 13-80-103(1)(c).

FN111. Colo.Rev.Stat. § 13-80-102(1)(a).

FN112. *Jones v. Cox,* 828 P.2d 218, 222 (Colo.1992).

The Rices argue that both statutes are general statutes, which would mean that the longer statute would apply. This, however, is not the case. In *Jones v. Cox,* the Colorado Supreme Court held that the statute applicable to outrageous conduct claims was a general tort statute.[FN113] Subsequently, in *Dawson v. Reider,* the court concluded that the statute applicable to actions against police officers was a specific statute.[FN114] Thus, the specific statute of limitations that applies to actions against police officers must control, and the district court did not err in applying the one-year statute of limitations to this case. Accordingly, this court can only consider Lieutenant Chinn's conduct after October 9, 1997, for Chief Hoey's conduct after May 23, 1995.

FN113. 828 P.2d at 221.

FN114. *Dawson v. Reider,* 872 P.2d 212, 214 (Colo.1994).

No event after October 9, 1997, can support an outrageous conduct claim, so the district court properly dismissed the outrageous conduct claim against Lieutenant Chinn. The only event after May 23, 1995, that can support an outrageous conduct claim is the meeting with Robert Weller, which is insufficient to establish an outrageous conduct claim. The Colorado Supreme Court has stated the elements necessary to establish such a claim: "1. The **\*370** defendant engaged in extreme and outrageous conduct; 2. The defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress[;] and 3. The plaintiff incurred severe emotional distress which was caused by the defendant's conduct." [FN115] The court went on to define outrageous conduct as "conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." [FN116] We cannot conclude that the conversation with Robert Weller, though probably mean-spirited and unkind, rose to the level of outrageous conduct contemplated by this tort. Accordingly, we affirm summary judgment as to the outrageous conduct claims.

FN115. *Culpepper v. Pearl Street Building, Inc.,* 877 P.2d 877, 882 (Colo.1994).

FN116. *Id.* at 882.

### III. CONCLUSION

**\*\*25** We hold the district court did not abuse its discretion when it concluded that Weller and Oulton were protected by the reporter privilege. We also affirm the district court's grant of summary judgment on the Rices' six § 1983 claims: (1) denial of access, (2) improper arrest, (3) illegal search, (4) privacy violations, (5) harm to reputation, and (6) retaliation. We also affirm as to the outrageous conduct claims.

AFFIRMED.

END OF DOCUMENT