IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 06-cv-02088-MSK-BNB

ROBERTA SILVER,

        Plaintiff,

v.

PRIMERO REORGANIZED SCHOOL DISTRICT NO. 2, and
DANIEL NUSCHY, JR.

        Defendants.

_____

# OPINION AND ORDER GRANTING, IN PART,
# MOTIONS FOR SUMMARY JUDGMENT
_____

**THIS MATTER** comes before the Court pursuant to Defendant Primero Reorganized

School District # 2's ("the District") Motion for Summary Judgment (**# 73**), the Plaintiff's

response (**# 80**), and the District's reply (**# 83**); and Defendant Nuschy's Motion for Summary

Judgment (**# 78**), the Plaintiff's response (**# 82**), and Defendant Nuschy's reply (**# 84**).

## I. FACTS

The Plaintiff commenced this action against, among others, the District and Defendant

Nuschy, alleging claims arising out of the end of a romantic relationship with Defendant Nuschy

and the termination of her employment with the District. As a result of certain rulings made by

the Court or stipulations among the parties, the Plaintiff currently alleges three causes of action:

(i) hostile environment sexual harassment under Title VII against the District; (ii) *quid pro quo*

sexual harassment under Title VII against the District; and (iii) outrageous conduct against Defendant Nuschy.

The facts, which are either undisputed or, where disputed, are taken in the light most favorable to the Plaintiff, are as follows. The Plaintiff was formerly employed by the District as a Teacher's Aide. Defendant Nuschy was the Principal of the school in which the Plaintiff worked. In November 2004, despite both individuals being married to others, the Plaintiff and Defendant Nuschy began a consensual romantic relationship. During the relationship, Defendant Nuschy would call the Plaintiff every morning as 6:00 a.m. to wish her a good morning, and would call her again when he got to the school, and again after school. She states that "we talked on the phone a lot[,] we couldn't see each other all the time." The Plaintiff explains that the relationship was not necessarily a well-kept secret, and at some point, the District's Superintendent, Michael Sparaco, told Defendant Nuschy "to be careful, that [the Plaintiff and Defendant Nuschy] were playing with fire" and "they could get burned." The Plaintiff discussed with Defendant Nuschy how the relationship could affect her employment, but Defendant Nuschy reassured the Plaintiff that she could not be fired for sleeping with him "because it was on our own time and they couldn't do – they couldn't fire me for something like that."[1] The Plaintiff testifies that she continued the relationship because she "was afraid to make him mad . . . because he was my boss and he would start treating me differently, too," although she was not asked and did not explain what caused her to reach that conclusion.

---

[1]The Plaintiff also spoke with another District employee, Heidi Dasko, who had just the opposite opinion. Ms. Dasko told the Plaintiff that if she were caught, "Yes, [the School Board members] would probably get rid of you."

In mid-March 2005, the Plaintiff tried to end the relationship, telling Defendant Nuschy that "it was getting out of hand and we needed to stop and resolve the problem" – "the problem" being "[i]n the school, with us, with just the chaos that was going on with everybody involved." At the time, Defendant Nuschy agreed, but later that evening, he called her "all night long," and later, visited the Plaintiff at her house, telling her that he did not want the relationship to end. The Plaintiff and Defendant Nuschy spent that evening together, and the Plaintiff decided not to end the relationship because "he made it so hard" and "I couldn't tell him no," although her statements give no indication as to whether the difficulties she was speaking of were personal or professional. After rekindling the relationship, the Plaintiff and Defendant Nuschy agreed to leave their spouses and move to Grand Junction together. The relationship continued, including various phone calls and e-mails from Defendant Nuschy that the Plaintiff acknowledges were once again welcome.

At some point in March 2005, the Plaintiff's husband came to the school and had an encounter with Defendant Nuschy. Defendant Nuschy sought and obtained a restraining order against the Plaintiff's husband. At that time, the Plaintiff and Mr. Sparaco had a discussion about the situation. The Plaintiff and Mr. Sparaco agreed that it would be best for the Plaintiff would stay on one side of the school building, away from the administrative office area where Defendant Nuschy worked.

In early April, the Plaintiff decided to again end the relationship with Defendant Nuschy. It is not clear precisely when this happened, although it appears that on or about April 10, the Plaintiff simply stopped taking Defendant Nuschy's phone calls. It is not clear what, if anything occurred between April 10 and April 12, but beginning on April 12, Defendant Nuschy began

leaving numerous messages on the Plaintiff's telephone answering machine,[2] entreating her to pick up the phone and/or talk to him, and generally pleading his case as to why she should resume the relationship. Nothing in the text of the messages explicitly threatens the Plaintiff with any particular consequences, although in some messages, Defendant Nuschy states that he knows that the Plaintiff is home. The Plaintiff testified that she perceived Defendant Nuschy's tone of voice as "scary."

On April 14, the Plaintiff tendered to the District a letter from her therapist, explaining that the Plaintiff had been undergoing treatment "for the last four weeks," and was suffering from depression and anxiety. The therapist noted that the Plaintiffs condition had deteriorated "over the last few weeks" and that she was "experiencing extreme emotional distress as a result of her workplace environment." Requesting that the Plaintiff obtain "distance from her workplace" as she continued treatment, the therapist requested that the Plaintiff be granted a medical leave of absence for the next 30 days. The District granted this request, and the Plaintiff remained away from the workplace from April 14 to mid-May.

The telephone calls from Defendant Nuschy continued, and Defendant Nuschy sent the Plaintiff five e-mail messages between April 14 and 17. These messages, like the telephone messages, are largely entreaties to the Plaintiff to reconsider her decision to end the relationship and to contact Defendant Nuschy. Nothing in the text of the messages is overtly threatening. Indeed, the Plaintiff responded to one of the messages on April 15, apologizing to Defendant

---

[2]According to the transcript submitted by the Plaintiff, Defendant Nuschy left one message at 9:00 p.m. on April 12; a message at approximately 11:00 a.m. and two messages around 8:30 p.m. on April 13; a series of 15 messages between 6:00 a.m. and noon on April 14; a series of 7 messages between 7:00 a.m. and 10:00 a.m. on April 15 and a single phone call later in the mid-afternoon of that day; and two messages around 8:30 a.m. on April 16.

Nuschy, offering some explanation for her decision, and consoling Defendant Nuschy that she continued to have feelings for him, but that "I can't go on with seeing you anymore." The message did not refer to Defendant Nuschy's prior attempts to contact the Plaintiff, nor specifically request that he cease those attempts.

On April 16, at approximately 8:30 a.m., Defendant Nuschy left his penultimate telephone message for the Plaintiff, requesting that she "pick up now, if not I'm going to come over to your house. So I just need to talk to you. We can talk over the phone or I can come over there. I'll be right there then if you don't want to pick up." Defendant Nuschy then went to the Plaintiff's house and knocked on the door, but the Plaintiff (who was home) did not answer and Defendant Nuschy left.

After Defendant Nuschy left, the Plaintiff decided to go into town, and thereafter, to her mother's house. As she approached her mother's house, she saw Defendant Nuschy in his car driving down the street. The Plaintiff states that Defendant Nuschy "turned around" – it is not clear whether she is referring to him turning the car around, or whether she is describing Defendant Nuschy turning his head to notice her as he continued driving forward – so she drove to another street "trying to lose him." Later that day, the Plaintiff's car and Defendant Nuschy's car were travelling in opposite directions on a city street. Defendant Nuschy's slowed his car down as it pulled even with the Plaintiff's car – which the Plaintiff interpreted as Defendant Nuschy trying to stop her – but upon noticing that the Plaintiff's mother was in the car with her, Defendant Nuschy sped up and drove away. The Plaintiff states that she considered Defendant Nuschy's behavior in visiting her house and "following her" in his car to be unwelcome and threatening.

Defendant Nuschy abruptly stopped calling the Plaintiff on April 17. The Plaintiff acknowledges that he made no further attempts to contact her after that date.

On April 18, the Plaintiff applied for a restraining order against Defendant Nuschy, reciting the events of April 16 – his visit to her house and the incidents in which he "followed" her. The court granted that restraining order on April 18, 2005. Although she continued to be away from school on her medical leave, the Plaintiff promptly advised the District of the restraining order against Defendant Nuschy. Other than providing the District with the letter, she did not request any particular accommodation to effectuate its terms or to assure her that she would not come into contact with Defendant Nuschy, but assumed that the District would make such arrangements.

On that same day, Mr. Sparaco issued a written letter to the Plaintiff, advising her that "you are being asked to stay in your immediate work area, the gym, and the cafeteria," and to come to the office area only when necessary to make copies or to deal with "school related matters."[3] The reason given for the request was "the circumstances that have arisen over the course of the past five weeks."

The Plaintiff states that this accommodation was unsatisfactory because "I was afraid to run into Mr. Nuschy in the hall or see him in the lunchroom. I was afraid to go into the gym. He walked the halls. He brought his son [who was a student in the Plaintiff's classroom] to school and I was afraid to have contact with him." She acknowledges that, beyond receiving the letter in

---

[3]On the same day, Mr. Sparaco also issued a memorandum to all staff, stating that "the rumor mill at Primero is completely out of control" and that "this staff is under the microscope in this community." He advised that "There will be a No Tolerance method of dealing with any further gossip involving our staff members." Mr. Sparaco testified that the rumors and gossip he was referring to concerned the Plaintiff's affair with Defendant Nuschy.

April, she did not communicate with anyone in the District regarding her concerns prior to returning to work in mid-May. She believes that the District learned of Defendant Nuschy's repeated phone calls to her from April 12 to April 16 "right before [she] came back for sure."

This testimony suggests the District learned of the phone calls near the time that she returned to work in mid-May, although the Plaintiff stated that she wanted to School Board "to tell him to stop bothering me, to leave me alone," which would suggest that the date occurred closer to the April 17 date when Defendant Nuschy ceased attempting to contact the Plaintiff. The Plaintiff admits, however, that she did not specifically ask the District or the School Board to take any particular action to stop Defendant Nuschy's conduct.

The Plaintiff returned from leave in mid-May, approximately six days before the end of the school year. She testified that she did not want to return to work, but she admits that she was not subjected to any harassment or abuse by anyone during the days between her return to work and the end of the school year. The record does not reveal whether she had any encounter with Defendant Nuschy during this time.

On or about May 26, 2005, the District's Board met to discuss a number of matters. According to Mr. Sparaco's testimony, Board Member Pat Mestas, whose child was enrolled in the Plaintiff's classroom, raised concerns about the Plaintiff's excessive absenteeism over the past two school years and suggested that the Board not renew the Plaintiff's employment. The Plaintiff denies having been excessively absent, pointing out that she had not exhausted her sick leave during the current school year,[4] that the District had chosen to re-employ her after the prior

---

[4]This fact appears to be in dispute. The District points to testimony by Mr. Sparaco in which he stated that the Plaintiff's request for a 30-day medical leave was acceptable, but that by this point, she had already exceeded her allowable sick days for the year.

year, and that no one had previously advised her that her attendance was a problem. The Plaintiff's husband, a Board Member but who was not present at the meeting, also disputes that the action was related to her job performance, in that "her reviews were good, the parents loved her." Mr. Sparaco concurred with the Board's concern, although he was unable to testify specifically as to how many absences the Plaintiff had had or when they were. The Board voted to not renew the Plaintiff's employment, effectively terminating her. The District has submitted affidavits from two Board members stating that their decision to terminate the Plaintiff was based solely on her absenteeism record.

## II. Issue Presented

The District moves **(#73)** for summary judgment on both of the Plaintiff's claims against it, arguing: (i) as to the hostile environment claim, the Plaintiff cannot show that she experienced severe or pervasive harassment, that the harassment affected her ability to work, and that the harassment was unwelcome; and (ii) as to the *quid pro quo* harassment claim, the Plaintiff cannot show that the District implicitly or explicitly conditioned an employment benefit on the Plaintiff's submission to Defendant Nuschy's conduct, nor that the District's stated reason for her termination is pretextual. Defendant Nuschy moves for summary judgment **(# 78)** on the outrageous conduct claim against him, arguing that the Plaintiff cannot show that the conduct complained of is sufficiently outrageous as to be actionable in tort, that he intended to inflict severe emotional distress upon her, or that she indeed suffered severe emotional distress.

# III. ANALYSIS

## A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If, as here, the moving party does not have the burden of proof at trial, the movant must point to one or more elements of a claim or defense on which it contends there is an absence of sufficient evidence that the non-movant is obligated to prove. In response, the non-movant must come forward with sufficient competent evidence to establish a *prima facie* claim or defense. If the non-movant does so, a trial is required; if the non-movant fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. The District's Motion**

    1. Hostile environment claim

Turning first to the Plaintiff's claim of hostile environment sexual harassment against the District, the Plaintiff must prove four elements: (i) that she is a member of a protected class under Title VII; (ii) that she was subject to severe and pervasive workplace harassment, sufficient to alter the terms and conditions of her employment; (iii) the harassment was "based on sex"; and (iv) the harassment was unwelcome. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007). In addition, the Plaintiff is required to establish a fifth element – that the employer can be held liable for the harassment – in one of several identified ways. *Id.*

The District's motion identifies the elements of the claim slightly differently, and does not cite the particular authority from which its elements are derived.[5] This Court will apply the elements as set forth by the 10th Circuit, and will interpret the District's arguments to apply to the relevant elements as described in cases like *Harsco*. In this respect, the Court understands the District to be challenging the Plaintiff's ability to establish the second and fourth elements – that the harassment was so severe and pervasive as to alter the terms and conditions of her employment, and that the harassment was unwelcome.

In evaluating this claim, the first step is to identify the particular acts that constitute the "workplace harassment" in this case. The Plaintiff appears to allege that the harassing conduct consisted of the numerous phone calls and e-mails by Defendant Nuschy to her in the period between April 12 and April 17, 2005, one visit to her house, and two instances in which he

---

[5]The District appears to have synthesized its understanding of the elements from the opinions of the Supreme Court addressing various aspects of hostile environment cases.

"followed" her in his car.   In addition, the Plaintiff argues that additional telephone calls and a visit by Defendant Nuschy when she previously attempted to end the relationship should also be considered as harassment.  The Court has some doubt that Defendant Nuschy's attempts to communicate with the Plaintiff after she attempted to break of the relationship in March 2005 can constitute unwelcome harassment, given that the Plaintiff apparently willingly (albeit reluctantly) acceded to Defendant Nuschy's entreaties.  Nevertheless, the Court will construe the evidence in the light most favorable to the Plaintiff and assume that Defendant Nuschy's conduct in March is also at issue.

In determining whether this conduct was so severe and pervasive as to alter the terms and conditions of the Plaintiff's employment, the Court considers several factors, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005).  The severity and pervasiveness element is judged from both a subjective and objective viewpoint, examining whether the Plaintiff personally found the conduct to be severe and pervasive, and whether a reasonable employee in the Plaintiff's position would have done so.  *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1097-98 (10th Cir. 1999).  The Court is mindful that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."  *Id.*

Here, examination of the severity and pervasiveness element is particularly difficult, in that all of the allegedly harassing conduct occurred off-duty and off-premises.  It is well-accepted that a person's private and consensual sexual activities do not constitute a waiver of his or her legal

11

protections against unwelcome and unsolicited sexual harassment. *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 (10th Cir. 1996). However, generally, an employer's liability extends only to "workplace" sexual harassment; that is, in general, an employer is not liable for harassment among co-workers that occurs after work hours and away from the workplace setting. *See e.g. Duggins ex rel Duggins v. Steak N' Shake, Inc,* 3 Fed.Appx. 302, 311 (6th Cir. 2001) (unpublished) (citing cases).

There are two potentially pertinent exceptions to the general rule. First, when an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, employer liability may arise. *Id.* Secondly, *Duggins* couches its general rule in terms of non-supervisory co-workers engaged in off-duty harassment. *Id.* Presumably, a supervisor who engages in off-duty, off-premises harassment of an employee gives rise to a different set of considerations, *see e.g. Huitt v. Market Street Hotel Corp.*, 1993 WL 245744 (D. Kan. 1993) (unpublished) ("For purposes of summary judgment motions, the court cannot exclude from its consideration those allegations of sexual conduct [by plaintiff's supervisor] which occurred after work hours"), although the considerations to be used in a case of off-duty harassment by a supervisor are not clearly spelled out.[6]

Here, the mere fact that Defendant Nuschy – the Plaintiff's supervisor – engaged in allegedly harassing behavior during the course of their romantic relationship is not, of itself, enough to support a claim of hostile environment harassment. All of the harassing conduct took place off school grounds and during the Plaintiff's non-working hours. The Plaintiff must

---

[6]In all likelihood, a supervisor's engaging in off-duty harassment bears on whether the employer can avoid vicarious liability for the harassment under cases like *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

articulate a way in which this harassment affected the terms and conditions of her employment. The Court can discern three possible ways in which this private conduct could arguably have affected the Plaintiff's employment: the Plaintiff's fear to return to work and encounter Defendant Nuschy, the restrictions placed upon her movement within the school, and the ultimate decision to terminate the Plaintiff. Thus, the Court considers the severity and pervasiveness of the harassment with these alleged workplace effects in mind.

Mindful of these considerations, the Court makes several observations with regard to the sufficiency of the Plaintiff's evidence that she was subjected to severe and pervasive harassment affecting her employment. First, the conduct the Plaintiff relies upon occurs in a relatively brief window of time – essentially a span of a few days between April 12 and April 17 (and, arguably, an additional evening in March). Although Defendant Nuschy's phone calls and other attempts to contact the Plaintiff during this period were indeed frequent, they ceased entirely after April 17. In addition, there is some question as to whether, to what degree, Defendant Nuschy's actions could be considered severe or threatening under either a subjective or objective standard. The Plaintiff states that she considered Defendant Nuschy's tone of voice in the calls as threatening, but her April 15 e-mail message informing him of her continued feelings for him calls this professed fear somewhat into question. It is even less clear whether a reasonable employee in the same situation would have felt threatened by the tone of his messages, which does not strike the Court as especially ominous. However, Defendant Nuschy's other conduct, particularly his insistence on communicating with the Plaintiff, two instances in which the Plaintiff states that Defendant Nuschy "followed her" in his car, and his Nuschy's uninvited visit to the Plaintiff's house are part of the totality of the circumstances that a factfinder might consider. In light of this

series of events, a factfinder might conclude that the specific conduct between April 12 and 17 was disturbing or threatening.

Putting aside the Plaintiff's non-renewal,[7] there is some evidence that Defendant Nuschy's harassment had workplace-based consequences for the Plaintiff. Most notably, the Plaintiff was subjected to restrictions on where she could go during the work day. Although there may be a dispute between the parties as to the actual effect of this policy, as well as whether it was a policy the Plaintiff had previously voluntarily agreed to abide by, taken in the light most favorable to the Plaintiff, imposition of a restriction on where an employee can go in the workplace could very well constitute a meaningful change in the terms and conditions of employment. As to the Plaintiff's fear of encountering Defendant Nuschy upon her return to work, the Court notes that notwithstanding the restrictions intended to keep the Plaintiff and Defendant Nuschy apart, nothing in the record indicates that the District considered Plaintiff's concerns or sought to modify Defendant Nuschy's authority over the Plaintiff. A fear of retribution by Defendant Nuschy through future negative performance evaluations or other employment actions might very well constitute a significant and detrimental change to the terms and conditions of the Plaintiff's employment.[8]

Faced with these considerations, the Court has some doubt as to whether a reasonable factfinder could conclude that the harassing conduct identified by the Plaintiff was sufficiently severe and pervasive as to alter her working conditions. However, mindful of the 10th Circuit's

---

[7]This issue is more appropriately considered in the context of the *quid pro quo* claim.

[8]Whether either of these adverse employment effects could support a significant damage award – given that the Plaintiff labored under them for only six days – is a matter for the parties' evaluation.

suggestion that this element is not conducive to resolution on summary judgment, the Court favors a trial.

The Court then turns to the other element challenged by the District – whether the Plaintiff can show that Defendant Nuschy's conduct was unwelcome. To constitute actionable harassment, the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive. *Ammon v. Baron Automotive Group*, 270 F.Supp.2d 1293, 1306 (D. Kan. 2003), *citing Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1108 (8th Cir.1998). The Plaintiff must show that, by her conduct, she indicated to Defendant Nuschy that the alleged harassment was unwelcome. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).

The Court notes that notwithstanding the Plaintiff's own assertion that she found all of Defendant Nuschy's communications between April 12 and April 17 unwelcome, the Plaintiff never explicitly instructed or requested that Defendant Nuschy to cease efforts to contact her. To the contrary, she responded on April 15, by email giving him an elaborate explanation for her decision to end the relationship. Nothing in her email requests that Defendant Nuschy to cease attempting to contact her, nor gives any indication that the Plaintiff considered Defendant Nuschy's prior communications to be unwelcome.

The Plaintiff contends that she communicated her desire not to speak with Defendant Nuschy through Denise Fernandez. Defendant Nuschy's testimony is to the contrary – that Ms. Fernandez only conveyed Plaintiff's lack of communication with him in the context of his possible move to Grand Junciton. According to Defendant Nuschy, Fernandez told him "that [the Plaintiff] wasn't talking to me because she heard I was moving with my wife to Grand Junction."

When asked whether Ms. Fernandez told him that the Plaintiff didn't want to talk to him, and he responded that Ms. Fernandez told him that "[the Plaintiff] is mad because she heard you were moving to Grand Junction." A communication that the Plaintiff "wasn't talking to" Defendant Nuschy, especially in this context, is distinctly different than an explicit statement that the Plaintiff did not want Defendant Nuschy to attempt any further to communicate with her.

Indeed, the Plaintiff and Defendant Nuschy's past relations and the contradictions between their statements and behavior inform the consideration of welcomeness. The Plaintiff admits that she previously attempted to end her relationship with Defendant Nuschy by avoiding his phone calls, but later decided to meet with him and rekindle the relationship. A reasonable factfinder might infer that the Plaintiff's refusal to take Defendant Nuschy's phone calls in April did not necessarily reflect that she found such calls unwelcome, and to the contrary, constituted behavior designed to feed his continued interest. Alternatively, a reasonable factfinder could infer that the Plaintiff's refusal to return his phone calls indicates that Defendant Nuschy's attempts to contact her were unwelcome

Once again, the Court finds that the Plaintiff's evidence on this point is weak, but not so insufficient that the Court is compelled to grant summary judgment. Accordingly, the District's motion for summary judgment on the hostile environment claim is denied. Whether the claim survives a motion under Fed. R. Civ. P. 50, or whether the Plaintiff's evidence will be sufficient to support a jury verdict in her favor remain matters to be considered at another time.

2. *Quid pro quo* claim

In contrast to the well-developed law governing hostile environment claims, claims for *quid pro quo* sexual harassment exist in a rather uncertain legal landscape. The classic

contemplation of the claim is that it is one which would require the Plaintiff to show that the Defendant "explicitly or implicitly conditioned a job, job benefit, or the absence of a job detriment upon [her] acceptance of sexual conduct." *See e.g. Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007). The parties appear to agree that the Plaintiff is required to make such a showing.[9] If, instead, the claim is analyzed more like a retaliation-type claim, *see Valentin-Almeyda*, 447 F.3d at 94, the employer then is required to come forth with a legitimate reason for the adverse employment action, and the employee would be required to show that that reason was pretextual, and that the real reason for the action was the employee's refusal to submit to the supervisor's demands.

Assuming that the Plaintiff must present some evidence that her submission to an ongoing relationship with Defendant Nuschy was a condition of retaining her job, *see Hicks v. Gates Rubber Co.*, 833 F.3d 1406, 1413 (10th Cir. 1987), the Plaintiff has not done so. She refers to several items of evidence that she contends support her assertion that the District – through Defendant Nuschy – conditioned her continued employment on her continuing her relationship

---

[9]Other courts contemplating the nature of a *quid pro quo* claim have viewed it much differently. In *Ellerth*, the Supreme Court appeared to distinguish a *quid pro quo* claim from a hostile environment claim only insofar as the former label applied where the employee allegedly suffered a tangible employment action as a result of the harassment, whereas the latter applied when the adverse employment action was intangible. 524 U.S. at 753-54. Yet another conception of the claim is that it mirrors the classic analysis for Title VII retaliation claims – that is, that the employer retaliated against the employee for rejecting a supervisor's advances. *See e.g. Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312-13 (11th Cir.2001); *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006). The parties' briefs do not wade into this legal swamp, and the Court is in no hurry to do so on its own. Fortunately, it need not ponder whether the Plaintiff must show an express or implied condition that she consent to a relationship with Defendant Nuschy to keep her job, or whether her termination should be examined under a retaliation-style framework, as the Plaintiff's *quid pro quo* claim fails under either conception.

with Defendant Nuschy. The Court will not address these various items individually, but notes that, with one exception, all of the cited evidence involves the Plaintiff's testimony as to her subjective beliefs as to what might occur if she ended the relationship. For example, the Plaintiff states that she "felt compelled" to continue the relationship, that she "was concerned of making Defendant Nuschy mad because he was her boss," and that she was concerned that Defendant Nuschy would treat her differently. Nowhere does she point to any statement by Defendant Nuschy or any other agent of the District that supplied some factual basis for these subjective beliefs.

The only item of evidence outside of Plaintiff's fears that might indicate a condition placed upon her continued employment is a fragment of a telephone message from Defendant Nuschy on April 15. That message states, in its entirety:

> And I gave you everything. I helped you out, gave you whatever you want, helped you get in there and you can't talk to me like a person and tell me what it is you want. I gave you money. I gave you everything. And you just can't even tell me hey, thank you, but I don't want this anymore. Just remember the things that I gave to you and did for you, and not even a simple closure and say thanks, but I don't want you.

The Plaintiff interprets the words "I helped you out . . . helped you get in there" to be a reference to getting the Plaintiff a job in the District.[10] Assuming this is accurate, nothing in the message suggests the corollary – that Defendant Nuschy would take the job away from her if she ended the relationship. (Indeed, the record reveals no evidence that Defendant Nuschy had any involvement

---

[10]Of course, if one interprets Defendant Nuschy's statement as the Plaintiff intends, one must also consider that Defendant Nuschy would have gotten her the job in the District before she began the relationship with him in November 2004. In this light, it is difficult to draw any connection that Defendant Nuschy helping the Plaintiff to get a job in the District and their romantic relationship.

whatsoever in the decision to terminate the Plaintiff.) Read in context with the telephone messages left by Defendant Nuschy a few minutes prior to this message, the reference to the Plaintiff not "want[ing] this anymore" refers to Defendant Nuschy's understanding that the Plaintiff and her husband were preparing "to move to Pueblo, and get away from everything here," rather than a threat to terminate her employment. Accordingly, the Court finds that the Plaintiff has failed to come forward with sufficient evidence to demonstrate that the District expressly or impliedly conditioned her continued employment upon her continuing her relationship with Defendant Nuschy.[11]

_____

[11] Were the Court to analyze the Plaintiff's *quid pro quo* claim like a classic retaliation claim, and examine whether the Plaintiff can show that the District's proffered reason for her termination is pretextual, the outcome remains the same. Arguably, the Plaintiff has raised a genuine issue of fact as to whether she had attendance problems sufficient to warrant termination by showing that she was never previously advised of any attendance concerns, and that she had not exhausted her accrued leave for the school year. But the Plaintiff has not offered any evidence to contradict the District's affidavits of two School Board members who state that the reason they voted to terminate the Plaintiff was due to her absences. It is not enough for the Plaintiff to show that the Board Members may have been mistaken as to the actual facts of her attendance; the Plaintiff must show that the Board Members did not subjectively believe that her attendance was problematic. *See Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007).

Even assuming that the Plaintiff could show that the District's reason for her termination is not its true reason, this is one of those peculiar cases where disproof of the employer's proffered reason for an action is not sufficient. The Plaintiff must also present evidence that the true reason was retaliation for her ending her relationship with Defendant Nuschy. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) ("there will be instances where, although the plaintiff has . . . set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision").

The record reflects that, in addition to terminating the Plaintiff, the District also demoted Defendant Nuschy from his position as Principal back to a position as classroom teacher. Although the record is not abundantly clear on this point, it appears that Defendant Nuschy's punishment was related to his handling of the romantic relationship with the Plaintiff. It would be illogical to find that the District both punished the Plaintiff for **not continuing her relationship** with Defendant Nuschy while simultaneously punishing Defendant Nuschy **for pursuing the relationship**. To the extent that the District's proffered absenteeism excuse is false, the only

Because the Plaintiff has not presented evidence that would suggest that her refusal to continue a relationship with Defendant Nuschy was the reason she was terminated, the District is entitled to summary judgment on her *quid pro quo* claim. Accordingly, the District's summary judgment motion is granted in part, with regard to the *quid pro quo* claim, and denied in part, with regard to the hostile environment claim

### C. Defendant Nuschy's motion

Finally, the Court turns to Defendant Nuschy's motion for summary judgment. The Plaintiff asserts a single claim against Defendant Nuschy for outrageous conduct. As the Court previously explained in dismissing the Plaintiff's outrageous conduct claims against other former defendants (# __) under Colorado law, an outrageous conduct claim requires a plaintiff to prove that the subject conduct "goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community." *Id., citing Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970) *and Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988). The tort is intended to reach "a very narrow" type of conduct. *Green v. Qwest Services Corp.*, 155 P.3d 383, 386-87 (Colo. App. 2006) (collecting cases). The type of conduct actionable under this claim is that which "the recitation of facts to an average member of the community would . . . lead him to exclaim 'Outrageous!'" *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970), *citing* Restatement (Second) <u>Torts</u>, § 46, comment d.

---

logical inference is that the District was dissatisfied with the way in which <u>both</u> she and Defendant Nuschy allowed their private relationship to spill over into and disrupt the school environment. In this respect, Mr. Sparaco's warning to Defendant Nuschy that both he and the Plaintiff were "playing with fire" by embarking upon the relationship proved quite prescient.

As discussed above, Defendant Nuschy's allegedly outrageous conduct is limited to the period from April 12 to April 17 - leaving 30 telephone messages, e-mailing her five times, visiting her house once, and following her with his car on two occasions. Viewed in the light most favorable to the Plaintiff, the Court also considers the fact that on one occasion in March, Defendant Nuschy responded to the Plaintiff's attempt to end their relationship by making several additional phone calls to the Plaintiff and visiting her house.[12] The Court finds that this conduct, taken as a whole, does not rise to the necessary level of outrageousness.

In this regard, the Court is particularly guided by the 10th Circuit's analysis in *Riske v. King Soopers*, 366 F.3d 1085 (10th Cir. 2004). There, the court considered a situation in which an employee's supervisor anonymously sent her gifts and increasingly disturbing notes on at least 10 occasions over two years, and "stalked her" around the workplace and whistled at her for a period of six months, despite at least 10 requests by the employee that he stop doing so. 366 F.3d at 1087-88. The trial court granted judgment as a matter of law to the defendant on the plaintiff's outrageous conduct claim, finding that the supervisor's behavior was not sufficiently outrageous to create liability. On appeal, the 10th Circuit conceded that the facts presented a "close case," but ultimately concluded that the conduct was sufficient to state a claim. *Id.* at 1089. In particular, the court was swayed by two considerations: the fact that the conduct had persisted over a considerable period of time, and the fact that the supervisor held a position of authority over the employee. *Id.* at 1089.

---

[12]The Court declines to consider the Plaintiff's claim that Defendant Nuschy made a "bet" with another District employee as to whether Defendant Nuschy could "have" the Plaintiff by the end of the year. The Plaintiff acknowledged in her deposition that she understood Defendant Nuschy's statement to this effect to have been a joke.

When compared to the facts of a "close case" like *Riske*, the Court finds that the facts of this case are insufficient to constitute actionable outrageous conduct. Although both cases involve the exacerbating factor of a supervisor engaging in harassing conduct towards an employee, this case does not involve the 10th Circuit's other major concern – namely, conduct extending over a lengthy period of time. Compared to harassment occurring over a period of two years in *Riske*, the Plaintiff here was bothered by Defendant Nuschy for less than a week. Similarly, the employee in *Riske* was "stalked" by her supervisor for a period of six months, whereas the Plaintiff has identified only four instances in which Defendant Nuschy followed her or visited her house, three of the four of which occurred within one day of each other. In *Riske*, the employee specifically asked the supervisor at least 10 times to cease his harassment, but the Plaintiff here never specifically asked Defendant Nuschy to cease his activities. There is nothing in *Riske* to suggest that the employee and the supervisor had any prior relationship, making the employee's repeated receipt of gifts and disturbing messages from an unidentified stranger especially unpleasant and worrisome. Here, the record here shows that the Plaintiff and Defendant Nuschy had been involved in a lengthy consensual romantic relationship that ended immediately prior to the allegedly outrageous conduct, and that the Plaintiff knew that it was Defendant Nuschy making the telephone calls and visiting her house.

Moreover, without attempting to excuse Defendant Nuschy's persistence, the Court also notes that it is not uncommon that the end of a romantic relationship is attenuated by a period in which the spurned party attempts to restore the relationship, and that the Plaintiff had acquiesced to such behavior previously. Taken as a whole, the Court finds that this case presents significantly less objectionable conduct than that found in *Riske*. If *Riske* presented the 10th

Circuit with a "close case," this case, with its less extensive and less objectionable conduct, must necessarily fall short of the mark. Accordingly, Defendant Nuschy's motion for summary judgment is granted.

## CONCLUSION

For the foregoing reasons, the District's Motion for Summary Judgment (# 73) is **GRANTED IN PART**, insofar as the District is entitled to summary judgment on the Plaintiff's claim of *quid pro quo* harassment, and **DENIED IN PART**, insofar as the Plaintiff's claim for hostile environment harassment must await trial. Defendant Nuschy's Motion for Summary Judgment (# 78) is **GRANTED**.

Dated this 13th day of March, 2008

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge